UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

PAULINE J. BENELLI,
     Plaintiff,

     v.                                    CIVIL ACTION NO.
                                           14-10785-MBB

COMMISSIONER OF SOCIAL SECURITY,
     Defendant.

**MEMORANDUM AND ORDER RE:**
**PLAINTIFF'S MOTION FOR AN ORDER REVERSING OR REMANDING THE**
**DECISION OF THE COMMISSIONER (DOCKET ENTRY # 16); DEFENDANT'S**
**MOTION FOR ORDER AFFIRMING THE DECISION OF THE COMMISSIONER**
**(DOCKET ENTRY # 21)**

**May 28, 2015**

**BOWLER, U.S.M.J.**

     Pending before this court are cross motions by the parties,
plaintiff Pauline J. Benelli ("plaintiff") and defendant
Commissioner of Social Security Administration ("Commissioner"
or "defendant").  Plaintiff seeks to "vacate the November 8,
2012, decision" of the administrative law judge ("ALJ") "and
remand [plaintiff's] claim for a new administrative hearing."
(Docket Entry # 16, p. 10).  The Commissioner moves to affirm
the denial of benefits under 42 U.S.C. § 405(g).  (Docket Entry
# 21).  In addition to raising other arguments, the parties
focus their dispute on the ALJ's determination that plaintiff's
alcohol abuse was a material contributing factor to the

disability determination, <u>see</u> 42 U.S.C. § 423(d)(2)(C), thereby warranting a denial of benefits.

PROCEDURAL HISTORY

On June 23, 2010, plaintiff filed an application for social security disability insurance benefits ("DBI") as well as an application for supplemental security income ("SSI"). (Tr. 116-117, 118-124). The applications reflect a disability onset date of August 15, 2009. (Tr. 116, 118). The initial denial notices, dated March 3, 2011, and an undated adult disability report show that plaintiff alleged disability based on depression, high blood pressure, attention deficit disorder ("ADD") and a cyst on her ovary. (Tr. 54, 57, 141). Both claims were initially denied on March 3, 2011, and denied again upon reconsideration on September 27, 2011. (Tr. 54, 57, 60, 63). On appeal, plaintiff additionally noted a "Debilitating double depression; dysthymia with major depressive episode." (Tr. 215).

On October 24, 2012, a hearing was conducted by the ALJ. (Tr. 10). Plaintiff was the only witness who testified at the hearing. (Tr. 26-49). In a decision issued on November 8, 2012, the ALJ concluded that plaintiff was not disabled. (Tr. 10-24). Plaintiff applied to the Appeals Council for review, which was denied on January 17, 2014. (Tr. 1).

FACTUAL BACKGROUND

2

Plaintiff was born January 9, 1962. (Tr. 116). At the time of the hearing she was 50 years old, although the onset of her alleged disability was 47 years of age. (Tr. 30, 116). Plaintiff is single and lives by herself in an apartment in Quincy, Massachusetts. (Tr. 29). She holds a bachelor of arts degree from Plymouth State College and a secretarial certificate from Katherine Gibbs. (Tr. 30). She was previously employed as a legal secretary or doing office work for approximately 30 years. (Tr. 30-31).

In two function reports dated July 10, 2010, and May 27, 2011, plaintiff detailed that, on a normal day, she prepares meals for herself, reads, watches television, cares for her cat, makes telephone calls, attends appointments if she has any, runs errands and takes her medication. (Tr. 162, 167, 194, 196). She stated that since the onset of her disability she does not get dressed every day (Tr. 166, 195) and, as reported in 2010, "stay[s] in pjs" (Tr. 166) or, as reported in 2011, "only dress[es] if I have to go out" (Tr. 195). She reported that she bathes every two to four days, washes her hair less often and has difficulty sleeping. (Tr. 166, 195). Plaintiff reported that she tries to go out "once a day." (Tr. 168, 197). She is able to drive and approximately once a week does her own shopping. (Tr. 168, 197). She described her hobbies and interests as "reading, watching TV, [and] play[ing] with [her]

cat." (Tr. 198). Plaintiff reported that she needs to read
written instructions "over and over," she follows spoken
instructions "not too well," handles stress "not well," handles
changes in routine "not well" and gets along with authority
figures "not too well." (Tr. 170-171, 199-200).

I. Medical History

Based on information regarding plaintiff's medications
submitted by plaintiff to the Social Security Administration
("SSA") dated September 7, 2012, plaintiff was prescribed
Effexor, 150 milligrams for depression; Adderall, 40 milligrams
for ADD; Quinipril, 20 milligrams for high blood pressure; and
Clonazepam, .5 milligram as needed for anxiety. (Tr. 235).
Plaintiff has taken antidepressants since 1994 and has a history
of depression "since high school." (Tr. 173, 582). Although
she alleged disability based on both physical and mental
impairments, plaintiff challenges the ALJ's conclusions only
with regard to her mental impairments. (Docket Entry # 4-10).

A. Physical Impairments

Plaintiff's primary care physician is Barbara Nath, M.D.
("Dr. Nath"). The record reflects that plaintiff sees Dr. Nath
at least once a year for a checkup or more often if she
experiences an illness. (Tr. 388-408). The first clinical note
in the record is dated September 12, 2005, and reflects that
plaintiff was previously diagnosed with depression but was

"[d]oing well on Celexa" at that time.  (Tr. 408).  The note
shows that plaintiff's blood pressure was high and she was
therefore prescribed hydrochlorothiazide at that visit.  (Tr.
408).  The note also reflects that plaintiff had a prescription
for 20 milligrams of Adderall.  (Tr. 408).

Dr. Nath's records from 2006 through 2010 continue to
reflect the monitoring of plaintiff's high blood pressure,
depression, osteoarthritis, ADD and medications.  (Tr. 406, 390,
396-400, 403, 404-407).  Dr. Nath continually prescribed
plaintiff Adderall during this time period.  (Tr. 390, 396-400,
403-407).  Beginning in 2007, Dr. Nath prescribed Quinipril for
plaintiff's high blood pressure.  (Tr. 406, 390, 396-400, 403-
406).  With regard to the management of plaintiff's depression,
the notes reflect that beginning in March 2006, and continuing
through July 2008, plaintiff was prescribed Lexapro, a selective
serotonin reuptake inhibitor ("SSRI").  (Tr. 403-407).  From
July 2008 to 2011, the notes show plaintiff was prescribed
Prozac, also an SSRI.  (Tr. 390, 396-399).  On February 2, 2009,
plaintiff reported hip and back pain to Dr. Nath.  (Tr. 399).
An X-ray of her right hip performed that day showed no fracture
or misalignment, but noted "mild degenerative changes of the
right SI joint."  (Tr. 401-402).

At the annual office visit with Dr. Nath on March 9, 2011,
plaintiff was described as "much better" since the Prozac dosage

was increased from 40 to 60 milligrams. (Tr. 388). It was noted she had been depressed since March 2010. (Tr. 388). Dr. Nath described plaintiff as "fe[eling] hopeful and energetic." Plaintiff reported, "I feel like my old self." (Tr. 388). Dr. Nath observed that her fatigue was "much better" and it "[r]esolved with better treatment of depression." (Tr. 388).

The record also noted plaintiff's medical history of hypertension, ADD, depression and osteoarthritis. (Tr. 388). In April 2010, plaintiff was diagnosed with an ovarian cyst after an ultrasound follow-up from her annual appointment. (Tr. 262, 247). The cyst was surgically removed on August 6, 2010. (Tr. 252-254). During a September 23, 2010 post-operative visit, plaintiff reported no pain, "feel[ing] great" and it was noted her incisions were "well healed." (Tr. 246).

Bertram Zarins, M.D. ("Dr. Zarins") saw plaintiff at Massachusetts General Hospital ("MGH") regarding her left knee on May 10, 2011. (Tr. 288-289). Plaintiff reported that she began to experience "worsening left knee pain" in November 2010. (Tr. 288). According to the clinical note, plaintiff's issues with her left knee began in 1978 after an injury which caused an anterior cruciate ligament rupture ("ACL"). (Tr. 288). Plaintiff subsequently underwent "an ACL reconstruction with hamstring autograft in 1980" and was described at the appointment with Dr. Zarins as "status post ACL reconstruction

6

(stable)." (Tr. 288). An X-ray of her left knee taken on May 10, 2011, revealed "medial compartment degenerative changes." (Tr. 288, 291). Dr. Zarins diagnosed her with "[l]eft knee degenerative joint disease, medial compartment." (Tr. 288).

Dr. Zarins noted that plaintiff complained of "anterior knee pain" and "describe[d] it more as a feeling of looseness than pain" but with "occasional stiffness" and occasional "searing/shooting pains on both her medial and lateral aspects of her knee." (Tr. 288). As set forth in the record, plaintiff stated that the pain "disrupted her ability to walk, climb stairs, run, squat, pivot or twist, sit for long periods of time with her knee bent or work." (Tr. 288). Dr. Zarins recommended a treatment plan of "activity modification, the use of NSAIDs [non-steroid anti-inflammatory drugs] and physical therapy exercises." (Tr. 288).

Theresa Kriston, M.D. ("Dr. Kriston") completed a physical residual functional capacity ("physical RFC") assessment on September 26, 2011. (Tr. 366-373). On the physical RFC, she listed plaintiff's primary diagnosis as left knee pain, with a secondary diagnosis of obesity and nonsevere impairments of high blood pressure and ovarian cysts. (Tr. 366, 368). Dr. Kriston found plaintiff could frequently lift or carry ten pounds, stand and/or walk for about six hours of an eight hour workday and sit for about six hours of an eight hour workday. (Tr. 367). She

additionally found plaintiff was limited to occasionally (less than one-third of the time) pushing foot controls with her left leg because of the documented issues with her left knee but additionally noted the knee was stable with no crepitus or tenderness. (Tr. 367-368). Dr. Kriston opined that plaintiff had postural limitations of only occasionally being able to balance, stoop, kneel, crouch, crawl, or to climb ladders, ropes, scaffolds, ramps or stairs. Dr. Kriston found no manipulative, visual, communicative or environmental limitations. (Tr. 369-370).

Dr. Zarins completed a medical source statement on May 31, 2012, which evaluated plaintiff's ability to do physical work-related activities. (Tr. 503-506). Dr. Zarins assessed that plaintiff could lift or carry up to 20 pounds occasionally[1] and up to ten pounds frequently,[2] stand or walk for at least two hours of an eight hour work day and that her abilities to sit or push/pull were unaffected. (Tr. 503-504). Additionally, he noted that plaintiff had postural limitations and could never climb ramps, stairs, ladders, rope, or scaffold, never crouch, crawl or stoop and only occasionally balance or kneel. (Tr.

---

[1] The form defines "occasionally" as being able to perform the activity for one-third of the time in an eight hour day.
[2] The form defines "frequently" as being able to perform the activity for one-third to two-thirds of the time in an eight hour day.

504).  Dr. Zarins noted no manipulative or communicative
limitations, though he indicated an environmental limitation
that plaintiff should avoid hazards such as heights and
machinery.  (Tr. 505-506).

B.  <u>Mental Impairments</u>

George Gardos, M.D. ("Dr. Gardos") first examined plaintiff
on July 29, 1994, and last examined her on October 18, 1999.
(Tr. 242).  He stated he had not seen her since 1999.  (Tr.
240).  He noted she experienced "chronic depression since age
[ten], stormy relationships, difficulty functioning" along with
"lapses in concentration," that "her mind often wandered" and
she "missed appointments."  (Tr. 242).  Dr. Gardos further
reported "during her depressions she tended to avoid making
decisions" and that she was "oversensitive to criticism."  (Tr.
241).

Amy Pransky ("Pransky"), a licensed clinical social worker,
saw plaintiff "beginning in 1993 with sporadic times in therapy
until 2000" and once on July 7, 2010.  (Tr. 236-238).  She
provided a diagnosis of dysthymic disorder and posttraumatic
stress disorder ("PTSD").  (Tr. 236).  Pransky mentioned that
plaintiff "has been unable to find employment in three years."
(Tr. 236).  Pransky noted plaintiff was "sleeping a lot due to
depression" but that she "seems able to complete tasks" and "was

able to maintain a job and have significant relationships."
(Tr. 236).

Plaintiff received counseling from South Bay Mental Health
("SBMH") beginning in September 9, 2010, and continuing until
December 27, 2011. (Tr. 293-360, 409-433). Adrianna Neagoe,
M.D. ("Dr. Neagoe") was responsible for plaintiff's medication
management through SBMH beginning on December 21, 2010. (Tr.
294-295, 410, 424-427). According to an adult comprehensive
assessment form completed upon plaintiff's intake on September
9, 2010, plaintiff was referred to SBMH by Brockton Hospital
"for depression, ADD and unemployment." (Tr. 322). As noted on
the form, plaintiff "sought treatment for feelings of depression
. . . generally surrounding relationships with family and
friends and motivation to work." (Tr. 330). At the time, she
was diagnosed with dysthymic disorder and her GAF score was 55.
(Tr. 330).

Plaintiff began seeing Melanie Lazar, M.A. ("Lazar") for
individual psychotherapy sessions at SBMH on September 9, 2010.
(Tr. 321). Plaintiff also saw Lazar on September 15, September
29 and October 6, 2010. (Tr. 318-320, 322-338). According to
the psychotherapy treatment notes, at these appointments
plaintiff and Lazar set treatment goals, created a yearlong
"individualized action plan" ("IAP") (Tr. 332-340) and discussed
plaintiff's depression and feelings as well as her goals and

10

difficulties related to finding employment.  (Tr. 318-321).  The first goal enumerated in the treatment plan was to "improve daily living," including the subcategory objectives of "identifying employment desires," "steady job," "develop[ing] stability in her life" and "improving home cleanliness."  (Tr. 332).  Plaintiff's second and third goals were to improve "interpersonal/social skills" and to manage her depression.  (Tr. 334-336).

On November 5, 2010, plaintiff started seeing Kristen Allaire ("Allaire"), a licensed mental health counselor, for individual psychotherapy sessions at SBMH.  (Tr. 316).  Plaintiff continued seeing Allaire until June 2011.  At this first appointment, Allaire noted that plaintiff was "tearful" and reported increased symptoms of "depression, difficulty concentrat[ing], sleeping more than the recommended amount" and "not enjoying her days."  (Tr. 316).  On December 16, 2010, however, Allaire recorded that plaintiff was in a "more [positive] mood today," reported less stress and had a "plan to the meet with Mass Rehab to discuss job opport[unities]."  (Tr. 312).

R. Peter Hurd, Ed.D. ("Dr. Hurd") conducted a consultative examination of plaintiff on December 16, 2010.  (Tr. 265-269).  He made a "tentative diagnosis" of a "Major Depressive Disorder recurrent moderate"; alcohol dependence; dysthymic disorder; ADD

and PTSD. (Tr. 266). He ruled out social phobia. (Tr. 266-267). He reported that plaintiff had previously seen therapists when she was depressed in high school in 1992 and then beginning again in June 2010. (Tr. 265). At the time of the interview, plaintiff denied any current substance abuse or history of substance dependence and stated she had last used alcohol two weeks prior. (Tr. 265-266). Plaintiff reported being arrested for operating under the influence in 2007. (Tr. 265). Dr. Hurd recorded that plaintiff "loses jobs when she calls in sick to [sic] often." (Tr. 265). He stated that, "Work becomes boring for her, she can't wake up an[d] become motivated to go to work." (Tr. 265). Additionally he noted, "She says, 'the novelty wears off or I have authority problems.'" (Tr. 265). Dr. Hurd found she had "lost a lot of friends" and plaintiff reported "difficulty making and keeping friends." (Tr. 265-266). Dr. Hurd also noted that plaintiff "feels that people are watching her, and has grandiose feelings, thinking she is superior to others." (Tr. 266).

During the examination with Dr. Hurd, plaintiff scored 30 out of a possible 30 on the mini mental status exam ("MMSE"). (Tr. 266). Plaintiff was described as "cooperative" and her "thought process appear[ed] organized." (Tr. 266). She "was alert and oriented to person, place and time." (Tr. 266). Dr. Hurd noted plaintiff "has a history of impulsive behaviors" and

was attending therapy at that time. (Tr. 266). He assessed that she "show[ed] partial insight into her illness or condition." (Tr. 266). He described plaintiff as moderately depressed and that "[h]er anxious and depressed features include sleep difficulties, anxiety [and] relationship conflicts." (Tr. 266). He also noted she "sleeps more than she wants to, up to 12 hours a day." (Tr. 266).

Richard Gould, Ed.D. ("Dr. Gould"), completed a psychiatric review technique form ("PRTF") on December 23, 2010. (Tr. 270-283). Dr. Gould reviewed plaintiff's medical records but did not examine her. Dr. Gould found plaintiff had nonsevere impairments, namely depression (under listing 12.04 affective disorders) and anxiety (under listing 12.06 anxiety-related disorders), and that neither impairment precisely satisfied the specific diagnostic criteria provided. (Tr. 273, 275). Dr. Gould also noted a substance addiction disorder under listing 12.09 that related to plaintiff's behavioral changes under listing 12.04 and listing 12.06. (Tr. 278). Dr. Gould found plaintiff to have mild functional limitations in activities of daily living, maintaining social functioning and maintaining concentration, persistence or pace, but no episodes of decompensation. (Tr. 280).

In compiling the report, Dr. Gould's notes and commentary show that he reviewed Dr. Hurd's report, information submitted

by Pransky and Dr. Gardos and a function report completed by plaintiff. (Tr. 282). Dr. Gould noted that plaintiff has a "fairly long history of depression and anxiety" and that she continues to use alcohol to some degree. (Tr. 282). He additionally reported she was "[c]urrently in psychotherapy and on psychotropics." (Tr. 282). Dr. Gould made specific reference to the function report where plaintiff "indicated she was depressed because she could not find work." (Tr. 282). He found plaintiff had "no difficulty with driving an automobile, attending meetings and appointments, maintaining her own home and performing all household chores" and opined "[h]er current level of activities and functioning suggests she possess the concentration, attention, focus and persistence necessary for work-related activities." (Tr. 282).

Plaintiff returned to SBMH on December 30, 2010, for an appointment with Allaire, who noted plaintiff again seemed positive and that, related to her Prozac dosage being increased to 40 milligrams, she stated, "'I feel more alert yet I am on the couch all day.'" (Tr. 313). At a subsequent appointment on February 3, 2011, Allaire noted that plaintiff again recounted symptoms of depression, along with an increase in isolation and "difficulty with motivating." (Tr. 310). Plaintiff identified the mood of her family members as "part of [the] trigger." (Tr. 310).

On March 17, 2011, after an increase in her Prozac dose to 60 milligrams, Allaire noted plaintiff reported "feeling 'more like her old self,' yet reports continued isolation and going [without] showering on some days in a row." (Tr. 307). On April 14, 2011, Allaire recorded that plaintiff reported "feeling more depressed," isolating after her condo association unexpectedly inspected her condo and "sleeping approximately [ten] [hours] per night." (Tr. 306). On May 5, 2011, plaintiff reported to Allaire that her Prozac dosage had been increased to 80 milligrams and rated her mood as a six out of ten. (Tr. 305). At an appointment on May 26, 2011, Allaire recorded that plaintiff reported a decrease in her anxiety and paranoia regarding her neighbors. (Tr. 304).

On June 23, 2011, plaintiff reported her father had been diagnosed with cancer and she expressed a desire to terminate treatment. (Tr. 304). In an uncompleted form noting a plan to terminate treatment, Allaire stated that plaintiff "reports she is gradually working on cleaning [her] home." (Tr. 429).

On July 28, 2011, plaintiff returned to SBMH and began seeing Kristin Sheridan, M.S. ("Sheridan"), for psychotherapy symptoms.[3] (Tr. 302). At that appointment, Sheridan described

---

[3] Although Pransky, Lazar, Allaire and Sheridan are not acceptable medical sources, see 20 C.F.R. § 416.913(a), an ALJ may consider "'evidence from other sources' . . . to 'show the

plaintiff's mood/affect as "depressed" and plaintiff as "tearful." (Tr. 302). Sheridan nonetheless reported plaintiff "is responsive to cognitive reframing." (Tr. 302). On September 6, 2011, Sheridan noted that plaintiff's mood was "irritable," she was alert and oriented and her behavior was "aggressive/angry." (Tr. 297).

Harry Senger, M.D. ("Dr. Senger"), performed a consultative examination of plaintiff on September 16, 2011, and filed a report. (Tr. 361-365). Dr. Senger's diagnoses of plaintiff were dysthymic disorder; major depressive disorder (partial syndrome); alcohol dependence disorder, continuing to drink; and PTSD. (Tr. 363). He also found she had a GAF score of 62. (Tr. 363). Plaintiff reported she had been depressed "most all her life and has been more depressed for the past 14 months or so." (Tr. 361). Dr. Senger noted plaintiff's report that she had trouble sleeping and concentrating, "is 'tired all the time'" and "report[ed] considerable guilt feelings," however, he opined that "[t]he other symptoms of major depression are not met." (Tr. 361). He recorded that plaintiff takes 80

severity of the applicant's impairment(s) and how it affects his or her ability to work.'" Voigt v. Colvin, 781 F.3d 871, 878 (7th Cir. 2015); see Pierce v. Colvin, 739 F.3d 1046, 1051 (7th Cir. 2014) (a provider who is not "'acceptable medical source[]' cannot offer 'medical opinions'"); 20 C.F.R. §§ 404.1513, 416.913, 416.902, 404.1527(a)(2).

milligrams of Prozac a day and ten to 20 milligrams of Adderall approximately twice a week. (Tr. 362).

Dr. Senger opined plaintiff met "the criteria for posttraumatic stress disorder," noting she has a "history of childhood and young adult sexual abuse." (Tr. 361-362). Plaintiff communicated that she experiences nightmares and that "she is nervous most all the time." (Tr. 362). Dr. Senger noted "some mild agoraphobia," although she could take the bus and shop in stores without difficulty when the stores were not crowded. (Tr. 362). Dr. Senger found plaintiff "me[t] the criteria for Borderline personality disorder with symptom traits reported of that condition – namely impulsiveness, day-to-day moodiness, stormy relations, inappropriate anger, rejection sensitivity, and frequent bored feelings." (Tr. 362).

During the examination, plaintiff recounted she engaged in "[n]o church, club or other social activities" and had no boyfriend. (Tr. 362). She reported doing chores "as needed" throughout her day, such as cooking, cleaning, laundry and shopping. She also goes shopping or to dinner with her mother about three times a week, cares for her cat and watches "'lots of television.'" (Tr. 362). She stated that she "has been working fairly regularly, except for getting fired for alcoholism three times over the years." (Tr. 362-363). Plaintiff conveyed that she last worked full-time in 2007 and

recently performed temporary seasonal clerical work in December 2010. (Tr. 361). Plaintiff "acknowledge[d] an alcohol problem, with one DUI and three other arrests for 'drunk and disorderly' in the past" and that she does not attend AA meetings.[4] (Tr. 362). She conveyed that she drinks "about [four to eight] 'huge glasses' of wine, beer or vodka, a few times a week." (Tr. 362). Dr. Senger noted plaintiff's report that she continues to drink several times a week. (Tr. 364).

During a mental status examination, Dr. Senger noted plaintiff was "in no distress" and described plaintiff as "personable, pleasant, engaging" and "relat[ing] easily and well here." (Tr. 363). He found "no indication of delusions, hallucinations, suicidality, or intoxication" and reported that her mood was "appropriate to thought content expressed." (Tr. 363). Dr. Senger detailed that plaintiff "shows no indication of cognitive impairment on the usual mental status testing." (Tr. 363-64). In fact, testing showed that plaintiff completed the serial sevens "easily" and "without error," abstracted a proverb and achieved a perfect score of 30 on "the Mini-Mental Status Exam." (Tr. 363-64). Dr. Senger further observed that plaintiff was "able to comprehend, remember, and carry out

---

[4] Plaintiff previously attended court ordered AA meetings but had not been to any on a voluntary basis.

instructions and to relate here very well for the exam." (Tr. 364).

At SBMH on September 22, 2011, Sheridan completed a new IAP. (Tr. 296). The plan indicated plaintiff was working on the goals of "reduc[ing] anxiety" and "decreas[ing] depressive [symptoms]." (Tr. 416, 418). An SBMH discharge summary plan reflects a discharge date of December 27, 2011. The stated reason for the discharge was that plaintiff met her goals and did not need services. The discharge summary reflects that plaintiff developed coping skills with respect to her depressed mood and irritability. (Tr. 410).

Edwin Davidson, M.D. ("Dr. Davidson") completed a PRTF on September 26, 2011. (Tr. 374-387). Like Dr. Hurd, Dr. Davidson found that plaintiff had the impairments of ADD, PTSD and a dysthymic disorder. Like Dr. Gould, Dr. Davidson found a substance abuse disorder, namely, alcohol dependence, and, similar to Dr. Senger, a personality disorder. Dr. Davidson considered that all of the impairments were "not severe." Dr. Davidson opined that these impairments were not severe. (Tr. 375, 377, 386). Like Dr. Gould, Dr. Davidson found that plaintiff had mild functional limitations in activities of daily living, maintaining social functioning and maintaining concentration, persistence or pace. (Tr. 384). He also found

insufficient evidence of any episodes of decompensation. (Tr. 384).

Natalie Lender, M.D. ("Dr. Lender") began treating plaintiff on March 7, 2012. (Tr. 582-583). During her initial evaluation, Dr. Lender diagnosed plaintiff with major depressive disorder (recurrent and moderate) and alcohol abuse. (Tr. 583). She noted plaintiff denied any history of suicide attempts, "but has suicidal ideations on and off." (Tr. 582). Dr. Lender observed that plaintiff's mood was anxious and depressed and her concentration was decreased. (Tr. 580). With regard to plaintiff's alcohol abuse, Dr. Lender noted that plaintiff has been a "binge drinker since high school" and "has a [history] of blackouts." (Tr. 582). Dr. Lender's notes reflect plaintiff's report that "most of her relatives and friends distance themselves from her due to her unemployment and drinking habits." (Tr. 582). Plaintiff also acknowledged a 2007 driving under the influence arrest. (Tr. 582). Dr. Lender further noted that plaintiff "worked in approximately 50 work places" and "[e]very time she would work for [three to four] months and then start to call [in] sick" and lose her job. (Tr. 582).

At the next appointment on April 4, 2012, Dr. Lender described that plaintiff "[a]ppear[ed] reliable, motivated and compliant." (Tr. 581). She noted that plaintiff previously tried Celexa, Wellbutrin and Lexapro and, although they worked

at first, they "became ineffective." (Tr. 581). At an appointment on May 16, 2012, plaintiff's antidepressant was switched to Effexor. (Tr. 580). Dr. Lender denoted plaintiff's mood as "'sad'" and that plaintiff reported, "'I am crying a lot, sad, no energy.'" (Tr. 580). Plaintiff's impulse control was "fair" and her insight and judgment were "good." (Tr. 583).

On June 20, 2012, Dr. Lender described plaintiff's mood as "'improved'" and that plaintiff reported, "'I am crying less, better energy.'" (Tr. 579). At the following appointment on July 18, 2012, Dr. Lender again noted that plaintiff's mood was "'improved.'" (Tr. 578). She assessed that plaintiff's depression was "improving" and she was "[m]ore motivated, more active." (Tr. 578). Dr. Lender recorded the same assessment of plaintiff on August 8, 2012, and additionally noted that her mood was "'good'" and recorded that she reported, "'I had a good month. In general[,] I feel better.'" (Tr. 577).

On September 5, 2012, Dr. Lender again noted that plaintiff's depression was "improving," she was "more active" as well as "[m]ore motivated" and appeared "able to make informed decision[s]." (Tr. 576). Her mood, however, was sad. In the final appointment note contained in the record, October 10, 2012, Dr. Lender recorded plaintiff informed her, "'It was a miracle last weekend – I had the desire and energy to clean my house.'" (Tr. 572). Dr. Lender reported that plaintiff's mood

was "'less sad,'" she was "more animated" and she had "started

individual therapy and liked the results." (Tr. 572).

According to Dr. Lender, plaintiff's judgment, insight, impulse

control and concentration were "fair" and she "appear[ed] able

to make informed decision[s]." (Tr. 572). Notably, her thought

process was "clear" and her thought content was "organized."

(Tr. 572). Plaintiff also maintained "good eye contact" during

the visit. (Tr. 572). Consistent with her prior descriptions,

Dr. Lender characterized plaintiff's depression as "improving,"

her appearance as "fairly groomed" and her behavior as

"cooperative." (Tr. 572). Dr. Lender depicted plaintiff as

"reliable, motivated and compliant." (Tr. 572).

    One week later on October 17, 2012, Dr. Lender completed a

medical source statement form regarding plaintiff's ability to

do mental, work related activities. (Tr. 569-570). The form

required Dr. Lender to place a checkmark next to various work

related qualities if Dr. Lender had the opinion that the quality

was "markedly limited" or "effectively precluded." (Tr. 569).

In contrast to Dr. Lender's treatment notes, Dr. Lender checked

plaintiff's ability to do the following as markedly limited or

effectively precluded: "maintain socially appropriate behavior

and adhere to basic standards"; understand and remember detailed

instructions; maintain attention and concentration sufficient to

perform work tasks throughout an eight hour work day; perform

activities within a schedule, maintain regular attendance and be punctual within customary tolerances; make simple work related decisions; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes;[5] travel in unfamiliar places or use public transportation; and set realistic goals or make plans independently of others. (Tr. 569-570). Dr. Lender additionally checked a number of other qualities as markedly limited or effectively precluded albeit not the ability to understand, remember and carry out very short and simple instructions. In a brief narrative, Dr. Lender set out a diagnosis of major depressive disorder (recurrent and moderate) supported by plaintiff's symptoms of a "depressed mood, low energy, impaired concentration, low motivation, hopelessness, low self-esteem, increased irritability and restlessness."[6] (Tr. 570).

---

[5] Dr. Lender's initial evaluation states that plaintiff had tried Adderall for her ADD before she lost her job and then stopped taking it. All of Dr. Lender's subsequent treatment notes reflect that plaintiff "[t]ried Adderall for ADD with good effect." (Tr. 572, 576-581).

[6] Dr. Lender's treatment notes uniformly describe plaintiff's concentration as "fair." Seven days before completing the form, Dr. Lender described plaintiff as "[m]ore motivated" and "more active." (Tr. 572).

Anne Modena ("Modena"), a licensed independent clinical social worker, began seeing plaintiff for individual therapy sessions on October 2, 2012. (Tr. 573-575). In an initial evaluation of plaintiff, Modena diagnosed plaintiff with major depressive disorder (moderate and recurrent) and alcohol dependence. (Tr. 574). Modena described plaintiff's mood as "lethargic, sad and tired." (Tr. 574). Modena noted that plaintiff's "[n]iece and sister-in-law keep their distance from her." (Tr. 574).

Modena detailed plaintiff's substance abuse history, noting that plaintiff "admits that she is an alcoholic" and "a binge drinker" whose "drinking problem began in the 11th grade when she was 16." (Tr. 573-574). She reported "binging once a month" and her "last binge was six days ago." (Tr. 574). Modena also noted plaintiff "has received complaints about her drinking, and she has tried to control her drinking," however, "[o]ne month is the longest she was able to abstain." (Tr. 574). Modena stated that plaintiff "does not want to stop drinking." (Tr. 574).

Plaintiff had an appointment with Modena on October 16, 2012. (Tr. 571). Modena described plaintiff's mood as "depressed" and she was "spending most of her time helping her mother care for her father." (Tr. 571). Modena recorded, "She continues to binge drink; she drank [seven] drinks in one

evening last week.  She does not want to stop drinking." (Tr. 571).

C.  State Disability Determination

The record contains evaluations and documents completed in connection with plaintiff's application for state disability benefits under the Emergency Aid to the Elderly, Disabled and Children program.  (Tr. 434-502).  On May 17, 2012, the state adjudicator at the University of Massachusetts Medical School Disability Evaluation Services determined that plaintiff met the Massachusetts Department of Transitional Assistance criteria for disability based on her depression.  (Tr. 434-435, 440, 445-446).  The adjudicator noted that "it does not appear med[ical] impairments would potentially meet SSI standards." (Tr. 440).

II.  Work History

At the October 2012 hearing, plaintiff testified that she last worked in December 2010 as a data entry specialist.  (Tr. 30).  The employment was seasonal and she held the position for approximately three and a half weeks.  (Tr. 31, 265).  She testified that her last significant period of employment was from 2005 to 2007, during which time she worked as a legal secretary until she was laid off.  (Tr. 31).  According to her testimony, the longest period of time plaintiff worked in the same office was three and a half years.  (Tr. 31).  In an undated disability report, plaintiff reported working as a legal

secretary at "various firms" from 1995 to 2007 and for four days in August 2008. (Tr. 141-142). Plaintiff estimated that on a daily basis while working as a legal secretary she would walk for two hours, stand for two hours, sit for six hours, write, type or handle small objects for six hours and handle large objects for two hours. (Tr. 143). Plaintiff stated she frequently lifted less than ten pounds. (Tr. 143). The heaviest weight she had lifted while in this job was 30 pounds, according to plaintiff. (Tr. 143).

In a work history report dated July 11, 2010, plaintiff also provided information about the tasks and requirements of her previous employment. (Tr. 151-161). Plaintiff detailed that while performing her most recent previous job as a legal secretary from 2005 to 2007, she would sit for seven hours, stand for half an hour during the day, walk for an hour and write, type or handle small objects for seven hours. (Tr. 155). She also recorded that she would lift or carry large file boxes for half an hour two to three times a week, that the heaviest weight she had lifted was 20 pounds and that she frequently lifted ten pounds. (Tr. 155).

III. <u>ALJ Hearing</u>

With regard to her physical impairments, plaintiff testified she sees Dr. Zarins for the degenerative joint disease of her left knee and Francis Blaire, a chiropractor, for issues

with her back and hip.  (Tr. 33).  Plaintiff detailed that she

has been diagnosed with arthritis in her neck, degenerative disc

disease and has had an ovarian cyst removed.  (Tr. 34).  She

additionally has been diagnosed with high blood pressure, which

is controlled with medication.  (Tr. 45).

At the hearing, plaintiff's attorney had plaintiff identify

each diagnosis relative to her psychological impairments.

Plaintiff identified her depression, her ADD and "Anxiety, post-

traumatic stress disorder."[7]  (Tr. 32).  Plaintiff's attorney

then elicited detailed testimony from plaintiff about her

depression, ADD and PTSD and how each condition impacts her

functional limitations making it difficult to return to work.

With respect to her depression, plaintiff's attorney asked

plaintiff about her symptoms and why the depression made it

difficult for her to return to work.  (Tr. 35).  Plaintiff

responded that her depression causes her to feel "exhausted all

the time" and she does not "have the energy to get out of bed in

the morning."  (Tr. 35).  She stated that sometimes she is "on

the couch all day" and she "can't even get into the shower every

day" or brush her teeth daily.  (Tr. 35).  She stated, "It's

---

[7] As to sleep apnea, plaintiff testified that she did not "know
if that's psychological."  (Tr. 32).  Elsewhere, she testified
that Dr. Nath treats her for the sleep apnea condition.

just everything is such a chore" and that she feels this way seven days a week. (Tr. 35). As a result, she has difficulty cleaning, she "get[s] behind in the laundry, dishes in the sink" and her "house is not clean." (Tr. 35). Plaintiff reported she takes care of her cat and she goes to the store "once or twice a week to buy cat food." (Tr. 35). She does not receive help from anyone managing her household chores. (Tr. 36). Plaintiff takes Effexor for her depression. (Tr. 36). At the time of the hearing she had been on Effexor for "about four or five months" and had noticed a slight improvement, though she did not characterize it as regaining a previous level of functioning, just that she was "not crying every day." (Tr. 36). She stated that she sees Dr. Lender once a month and Molena twice a month for counseling sessions. (Tr. 33, 37).

Plaintiff also testified about her diagnosis of ADD, for which she takes Adderall. (Tr. 37). She testified that she has been prescribed medication to manage her ADD for "five or eight years."[8] (Tr. 37). When asked if she got "any benefit from the Adderall, the Ritalin," plaintiff replied "not too much." (Tr. 45). Plaintiff described the effect of her ADD on her ability to work as that she "get[s] distracted very easily" and she

---

[8] Plaintiff was previously prescribed Ritalin for her ADD, but at some point her prescription was switched to Adderall. (Tr. 37).

"couldn't concentrate on the paperwork." (Tr. 37). She would "avoid the computer and what [she was] working on to go talk with friends," "go to the bathroom just to get away from [her] desk," take longer breaks or "do anything to get away from the computer" because it "was just making [her] crazy." (Tr. 37). Plaintiff testified she had so much trouble concentrating that she "wanted to avoid [her] job so [she'd] call in sick and stay home." (Tr. 37-38). Plaintiff also stated that her depression could also have been a factor in her behavior of staying home from work. (Tr. 38).

When plaintiff was asked by the ALJ to describe the symptoms she experiences as a result of her PTSD and how those symptoms interfered with her ability to function, plaintiff testified she has trouble sleeping and experiences nightmares. (Tr. 35, 38). She also stated that she has night sweats and awakens "every two hours" during the night. (Tr. 38). She described that she "feel[s] paranoid, like people are talking about [her], [her] neighbors." (Tr. 38). As a result, she does not "even want people to look at [her]" and if she goes out, she does so in the evening. (Tr. 38). Her symptoms are aggravated by thinking about unpleasant events that occurred in the past, which happens at night. (Tr. 38-39).

Plaintiff acknowledged that in the past her alcohol use had been an impairing factor in her not being successful at work.

(Tr. 43).  She also stated, however, that she "think[s] [her] drinking has improved" and, although she could not say "for sure," did not "think it would be a problem now."  (Tr. 43).

Plaintiff testified she often remains in her pajamas all day.  (Tr. 44).  She has arthritis and has difficulty with buttons and zippers, so she does not use them.  (Tr. 44).  She feeds her cat twice a day and loads the dishwasher approximately once a week.  (Tr. 44).  She prepares her own meals.  (Tr. 44). Occasionally, she will have lunch with her mother or take her father, who has cancer, for a drive.  (Tr. 44).  She testified that she helps care for her father.  She pays her credit card bills and her father pays for her utilities.  (Tr. 44).

While performing her previous work as a legal secretary, plaintiff testified she spent about 80% of her time typing or actively using the computer.  (Tr. 41).  She testified that she experiences pain and problems with her neck and spine.  (Tr. 39, 40).  She testified that she was "getting arthritis in [her] hands and [her] joints," specifically, her wrists, knuckles and sometimes elbows, and would not be able to type "[l]ike [she] used to."  (Tr. 41).  With regards to her neck pain, she described it as perpetual and "a dull ache and sometimes [she] hear[s] like the bones cracking."  (Tr. 39).  She expressed concern about looking at a computer screen, specifically that it would need to be raised because, according to plaintiff, looking

up and down while using the computer is "just so bad for your neck." (Tr. 40). She indicated that her lower back pain worsens if she is "sitting for any period of time" or sitting throughout the day. (Tr. 39). She stated that she did not think she would be able to sit eight hours a day at a job. (Tr. 40). She added that sometimes her hip goes out and then walking is painful. (Tr. 39). Though plaintiff had previously seen a chiropractor about her neck and back, she has not been able to see the chiropractor for some time because her insurance does not cover it and she cannot afford it. (Tr. 40). Plaintiff reported that the chiropractor advised her to "get up every hour and walk around." (Tr. 40).

Plaintiff additionally testified that she had reconstructive surgery on her knee in 1980. (Tr. 33). She has since been diagnosed with degenerative joint disease in her left knee. (Tr. 41). She further testified, "It seems like every six months I reinjure my knee and it's very difficult to walk." (Tr. 41). Plaintiff explained that she walks with a limp and takes ibuprofen for her knee. (Tr. 42). She stated that she does not believe she could be on her feet for six hours a day. (Tr. 42). She also responded that she did not think she could perform a job that required her to lift up to 20 pounds two to three hours a day and ten pounds more frequently throughout the day because of her back and her knuckles. (Tr. 43).

I.  Jurisdiction and Standard of Review

Under the Social Security Act, the court has the power to review a final decision denying disability benefits and, based on the pleadings and the record, enter "a judgment affirming, modifying or reversing the decision of the Commissioner of Social Security with or without remanding the case for rehearing."  42 U.S.C. § 405(g).  The ALJ's findings of fact are conclusive if supported by substantial evidence.  See Richardson v. Perales, 402 U.S. 389, 390 (1971); Seavey v. Barnhart, 276 F.3d 1, 9 (1st Cir. 2001); Manso-Pizarro v. Sec'y of Health and Human Services, 76 F.3d 15, 16 (1st Cir. 1996); see also Astralis Condominium Ass'n v. Sec'y of Housing and Urban Dev., 620 F.3d 62, 66 (1st Cir. 2010) ("ALJ's factual findings are binding as long as they are supported by substantial evidence in the record as a whole").  The ALJ's findings are not conclusive, however, if "derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts." Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999).  "The resolution of conflicts in the evidence and the ultimate determination of disability are for the ALJ, not the courts." Sanchez v. Barnhart, 230 F.Supp.2d 250 (D.P.R. 2002); Seavey v. Barnhart, 276 F.3d at 9; Rodriguez v. Sec'y of Health and Human Services, 647 F.2d 218, 222 (1st Cir. 1981).  Even if the record arguably would support a

different conclusion, this court must affirm the ALJ's decision as long as it is supported by substantial evidence. <u>Rodriguez v. Sec'y of Health and Human Services</u>, 819 F.2d 1, 2 (1st Cir. 1987).

Substantial evidence exists if when "reviewing the evidence in the record as a whole," a reasonable mind "could accept it as adequate to support the Commissioner's conclusion." <u>Rodriguez v. Sec'y of Health and Human Services</u>, 647 F.2d at 222; <u>see</u> <u>Musto v. Halter</u>, 135 F.Supp.2d 220, 225 (1st Cir. 2001) ("'a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the Commissioner's] conclusion'") (quoting <u>Ortiz v. Sec'y of Health and Human Services</u>, 955 F.2d 765, 769 (1st Cir. 1991)). "Substantial evidence is more than a scintilla of evidence that a reasonable person could find sufficient to support the result." <u>Musto v. Halter</u>, 135 F.Supp.3d at 225.

The determination of whether the evidence supporting the ALJ's finding is substantial "must be made upon an evaluation of the record as a whole." <u>Brown v. Apfel</u>, 71 F.Supp.2d 28, 30 (D.R.I. 1999). The ALJ has a duty to develop the record fairly and fully. <u>See</u> <u>Heggarty v. Sullivan</u>, 947 F.2d 990, 997 (1st Cir. 1991).

The ultimate issue is whether plaintiff is disabled within the meaning of 42 U.S.C. §§ 423(d) and 423(f).  The Social Security Act defines a disability as:

> [I]nability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A).  The impairment must be of such severity that the claimant is not only unable to do her previous work but "'considering her age, education, and work experience, engage in any kind of substantial work which exists in the national economy.'"  Deblois v. Sec'y of Health and Human Services, 686 F.2d 76, 79 (1st Cir. 1982) (quoting 42 U.S.C. § 423(d)(2)(A)).

To determine whether a claimant is disabled within the meaning of the statute, the SSA applies a five step evaluation process and considers all of the evidence in the claimant's case record.  20 C.F.R. §§ 404.1520 & 416.920; see Mills v. Apfel, 244 F.3d 1, 2 (1st Cir. 2001); Goodermote v. Sec'y of Health and Human Services, 690 F.2d 5, 6 (1st Cir. 1982).  In the first step, the claimant is not disabled if he or she is currently engaged in substantial gainful activity.  See Goodermote v. Sec'y of Health and Human Services, 690 F.2d at 6.  If the claimant is not engaged in substantial gainful activity, the decision maker proceeds to the second step to evaluate if the

claimant has a severe impairment or combination of impairments.
See id. An impairment or combination of impairments must meet
the durational requirement and "significantly limit[]
[claimant's] physical ability to do basic work activities" in
order to be severe. 20 C.F.R. §§ 404.1509 & 416.909; see
Goodermote v. Sec'y of Health and Human Services, 690 F.2d at 7.
If the claimant has a severe impairment or combination of
impairments, then the analysis proceeds to the third step and
the ALJ determines if the claimant's severe impairment or
combination of impairments meets or is medically equivalent to
one of the listed impairments in Appendix 1, Subpart P, Part 404
of the Code of Federal Regulations. 20 C.F.R. §§ 404.1520(d) &
416.920(a)(4)(iii); see Goodermote v. Sec'y of Health and Human
Services, 690 F.2d at 7. If the impairment or combination of
impairments medically equals a listed impairment then the
claimant is disabled; if not, the analysis proceeds to step
four. See Goodermote v. Sec'y of Health and Human Services, 690
F.2d at 7.

At step four, the ALJ must determine if the claimant can
perform any of his or her previous relevant work by comparing
the claimant's current mental and physical residual functional
capacity ("RFC") with the mental and physical demands of
previous work. Manso-Pizzaro v. Sec'y of Health and Human
Services, 76 F.3d at 17. After determining the claimant's RFC,

step four requires the ALJ to: (1) ascertain "the physical and mental demands" of the claimant's past relevant work; and (2) determine whether the claimant's "RFC would permit a return to" the past relevant work. SSR Ruling 82-62, 1982 WL 31386, at *4 (1982) ("SSR 82-62"); Hidalgo-Rosa v. Colvin, 40 F.Supp.3d 240, 244 (D.P.R. 2014). If the claimant can perform any of her past relevant work, the claimant is not disabled. See Goodermote v. Sec'y of Health and Human Services, 690 F.2d at 7. In the first four steps, the burden to provide evidence and prove his or her impairment and inability to perform prior work rests with the claimant. See Manso-Pizzaro v. Sec'y of Health and Human Services, 76 F.3d at 17; Freeman v. Barnhart, 274 F.3d 606, 608 (1st Cir. 2001) ("applicant has the burden of production and proof at the first four steps of the process").

If the claimant successfully satisfies his or her burden through step four, meaning the claimant is determined not to be able to perform any of his or her relevant prior employment, the burden shifts to the Commissioner to show the existence of a significant number of jobs in the national economy the claimant could perform. 20 C.F.R. §§ 404.1520(g) & 416.920(g); Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987); Goodermote v. Sec'y of Health and Human Services, 690 F.2d at 7; Rosado v. Sec'y of Health and Human Services, 807 F. 2d 292, 294 (1st Cir. 1986). In making this determination at step five, the decision maker

must consider the claimant's RFC, age, education and work experience.  20 C.F.R. §§ 404.1520(g) & 416.920(g).  The claimant is not disabled if jobs the claimant can do exist in significant numbers in the national economy.  20 C.F.R. §§ 404.1520, 416.920, 404.1545 & 416.945.

If at any step in the sequential process there is a finding that the claimant is disabled and there is medical evidence of drug or alcohol abuse, the decision maker must determine if such abuse was a "material contributing factor to the disability determination."  42 U.S.C. § 423(d)(2)(C).  If the drug or alcohol abuse is a material contributing factor, then the claimant is not disabled.

II.  ALJ's Decision and Analysis

At step one, the ALJ determined plaintiff had not engaged in substantial gainful activity since the alleged onset of her disability.  (Tr. 12-13).  He determined at step two that plaintiff suffers from the severe impairments of "mild left knee degenerative joint disease, obesity, depression, anxiety, and alcohol abuse."  (Tr. 13).  He found plaintiff to have the impairments of "hypertension, ovarian cysts, and a spinal disorder," which he determined "do not cause the claimant more than minimal functional limitations and are therefore nonsevere."  (Tr. 14).  He additionally found there was no

evidence in the record to support plaintiff's claim of stomach pain. (Tr. 15).

At step three, the ALJ determined that plaintiff's "severe depressive disorder, including her alcohol abuse, [met] listings, 12.04 and 12.09" of 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 15).[9]  With respect to listings 12.04 and 12.09, he found the "'paragraph A'" criteria was satisfied because plaintiff has major depressive disorder and alcohol dependence and cited to the diagnoses by Dr. Hurd and Dr. Gould. (Tr. 15).  Still including her alcohol use, the ALJ next determined that, with regard to the "paragraph B" criteria, plaintiff "has mild restriction" in activities of daily living, "marked difficulties" in social functioning, "marked difficulties" in maintaining concentration, persistence or pace

---

[9]  Plaintiff points out, correctly, that at step three the ALJ did not expressly address plaintiff's severe anxiety impairment or determine whether it met listing 12.06 as an "anxiety-related disorder."  That said, in the section of the decision addressing step two with alcohol abuse, the ALJ summarized Dr. Gould's diagnosis of an anxiety disorder and the ALJ referred to it again when considering the severity of plaintiff's remaining limitations without alcohol abuse. (Tr. 13, 17).  The ALJ also expressly recognized the PTSD diagnosis by Dr. Hurd as well as the more remote PTSD diagnoses by Dr. Gardos and Pransky. (Tr. 13).  "The Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition ('DSM-IV'), classifies PTSD as an anxiety disorder."  National Organization of Veterans' Advocates, Inc. v. Secretary of Veterans Affairs, 669 F.3d 1340, 1343 (C.A.Fed. 2012).

and no episodes of decompensation.[10]  (Tr. 16).  The ALJ
therefore determined that with alcohol abuse plaintiff was under
a disability at step three.  (Tr. 11, 15).

At step three with respect to the finding of mild
limitations in activities of daily living, the ALJ relied on Dr.
Gould's notes that "claimant has no difficulty driving an
automobile, attending her meetings and appointments, maintaining
her own home, and performing her household chores."  (Tr. 16).
He also utilized information from the reports of Dr. Senger and
Dr. Lender.  (Tr. 16).

In making his determination that plaintiff has "marked
difficulties" in social functioning at step three, the ALJ cited
to evidence and opinions from the reports of Dr. Hurd, Dr.
Senger, Dr. Kriston, Modena and Dr. Lender.  (Tr. 16).  The
ALJ's discussion of plaintiff's social functioning depicted by
these physicians focused on plaintiff's alcohol use.  Thus, the
ALJ noted that plaintiff "was fired for alcoholism three times,"
"drinks about 4-8 'huge glasses' of wine, beer or vodka[] a few
times a week," has "a DUI arrest and three other arrests for

---

[10]  When considering only listing 12.04, an affective disorder
leads to a disability finding if a claimant meets the paragraph
A criteria and has "marked" limitations in two of the three
paragraph B criteria or repeated episodes of decompensation.
See 20 C.F.R. §§ 416.920a, 404.1520a; Hilkemeyer v. Barnhart,
380 F.3d 441, 446 (8th Cir. 2004).

'drunk and disorderly' conduct" and "does not attend AA
meetings," as reflected in Dr. Senger's report. (Tr. 16, 362-
363). Dr. Lender noted similar findings and the ALJ explicitly
cited Dr. Lender's March 2012 finding that, "Most of
[plaintiff's] relatives and friends distance themselves from
[her], due to her unemployment and drinking habits." (Tr. 16,
582). Finally, the ALJ noted plaintiff's "history of black
outs, with others complaining about her drinking," and her
admission that she "is an alcoholic," as stated in Modena's
notes from the October 2012 appointment. (Tr. 16, 574). At
this step in the sequential process, the ALJ did not cite or
rely on the findings made by Dr. Gould, including his finding
that plaintiff's social functioning was mild. Likewise, the ALJ
did not cite or rely on Dr. Davidson's finding of a mild
limitation. (Tr. 16).

In finding "marked difficulties" in maintaining
concentration, persistence or pace, the ALJ cited to evidence
and opinions form the reports of Dr. Senger, Dr. Lender and
Modena. (Tr. 16). Here again, the ALJ focused on the reports
of alcohol abuse. He cited findings in Dr. Senger's September
2011 consultive examination report that plaintiff acknowledged
her alcohol problem and has "continuing untreated alcohol
dependence." (Tr. 16, 362). In addition to noting the three
terminations for alcohol, the ALJ cited plaintiff's history of

working in "50 work places, and every time she would work for 3-4 months" and then "start to call out sick and lose her job," as noted by Dr. Lender in 2012. (Tr. 16, 582). The ALJ additionally noted Modena's description that plaintiff presented with "depression and binge drinking" and did "not want to stop drinking." (Tr. 16, 573). In arriving at a finding of a marked limitation, the ALJ again do not rely on the "mild" limitations found by Dr. Gould or Dr. Davidson. Considering these findings, specifically that plaintiff suffers from marked restrictions in the above two categories, the ALJ therefore determined the paragraph B criteria were satisfied when including her alcohol abuse. (Tr. 15-16).

With respect to the above findings, plaintiff repeatedly argues that the ALJ "*rejected* the opinions" of Dr. Gould and Dr. Davidson, the non-examining psychologists, "finding, instead, that Plaintiff's depression and anxiety constitute *severe impairments*." (Docket Entry # 24). In point of fact, the ALJ did not reject these opinions. Nowhere does the ALJ attribute Dr. Gould's or Dr. Davidson's finding "little weight" or "no weight." Rather, in determining severity, the ALJ explained that Dr. Gould found plaintiff had "a depressive disorder, an anxiety disorder, and a substance addiction disorder." (Tr. 13). The ALJ did not recite or otherwise rely upon Dr. Gould's functional limitations findings at step two. See Evangelista v.

41

Secretary of Health and Human Services, 826 F.2d 136, 144 (1st
Cir. 1987) (recognizing that ALJ is entitled to "piece together
the relevant medical facts from the findings and opinions of
multiple physicians").  As explained above, the ALJ relied on
the opinions of other medical sources at step three to arrive at
the marked limitations in social functioning and concentration,
persistence or pace.  Accordingly, there was nothing
contradictory when the ALJ later relied on Dr. Gould's opinions
and findings in determining that, without alcohol abuse,
plaintiff's mental impairments were not severe.  The ALJ did not
reject the opinion of Dr. Davidson for the simple reason that he
did not cite or rely on Dr. Davidson's opinion in the decision.

        Plaintiff's related argument that "the ALJ made no finding
that he gave any weight to the opinions of either Dr. Gould or
Dr. Davidson" in violation of SSR 96-6p, 1996 WL 374180 (July 2,
1996) ("SSR 96-6p"), is not well taken.  Dr. Davidson completed
a PRTF nine months after Dr. Gould and came to the same
conclusions as Dr. Gould regarding plaintiff's mild functional
limitations.  Both opinions support a finding of nonseverity and
a finding that plaintiff is not disabled.  The ALJ's failure to
cite Dr. Davidson's opinion was therefore, at most, harmless
error.  See Ward v. Commissioner of Social Security, 211 F.3d
652, 656 (1st Cir. 2000). As explained in Ward:

> While an error of law by the ALJ may necessitate a remand, see Da Rosa, 803 F.2d at 26, a remand is not essential if it will amount to no more than an empty exercise. See Dantran, Inc. v. United States Dep't of Labor, 171 F.3d 58, 73 (1st Cir. 1999); Schaal v. Apfel, 134 F.3d 496, 504 (2nd Cir. 1998) ("Where application of the correct legal standard could lead to only one conclusion, we need not remand.").

Id. Here, Dr. Davidson's opinions as to the existence of depression, a substance addiction disorder and the paragraph B functional limitations duplicate the findings by Dr. Gould but without Dr. Gould's detailed explanations and support. As an aside, Dr. Davidson's opinion as to a dysthmic disorder is not carried over into the commentary section and is otherwise duplicated and cumulative of the dysthmic disorder diagnosed by Dr. Hurd and Dr. Senger and considered by the ALJ.

As to Dr. Gould, SSR 96-6p instructs that ALJs "may not ignore" the opinions of state agency psychologists "and must explain the weight given to these opinions in their decisions." SSR 96-6p, 1996 WL 374180, at *1; see also 26 C.F.R. §§ 404.1527 & 416.927. SSR 96-6p further requires the ALJ to consider the findings of state agency psychologists regarding "the nature and severity of an individual's impairment(s) as opinions of nonexamining . . . psychologists." SSR 96-6p, 1996 WL 374180, at *2. Here, although the ALJ did not use the phrase "weight" to describe his reliance on the opinions and functional limitations found by Dr. Gould, it is evident that the ALJ afforded the findings significant weight because he cited and

discussed them at length in making the key change from mild to marked in social functioning and in maintaining concentration, persistence or pace.

The ALJ's reliance on Dr. Gould's findings vis-à-vis nonseverity (Tr. 19) and RFC (Tr. 22) was entirely appropriate. As explained in the relevant regulations cited in SSR 96-6p, "The better an explanation a source provides for an opinion, the more weight we will give that opinion." 20 C.F.R. § 404.1527(c)(3), (e); 20 C.F.R. § 416.927(c)(3), (e). Dr. Gould discussed and summarized the medical record at length in the commentary section of the PRTF (Tr. 282) and the ALJ cited and relied upon these detailed findings (Tr. 19, 22).

After finding a disability at step three with alcohol abuse, the ALJ determined that there was medical evidence of a substance abuse disorder, i.e., alcoholism.[11] Accordingly, he considered whether the "substance use disorder [was] a contributing factor material to the determination of disability." (Tr. 12). Initially, the ALJ revisited the

---

[11] The record provides substantial evidence for the finding. (Tr. 265-266, 572, 576-583). In fact, Dr. Lender repeatedly diagnosed plaintiff as having alcohol dependence under code 303.90 in the Diagnostic and Statistical Manual of Mental Disorders, commonly referred to as the DSM-IV. See Darst v. Interstate Brands Corp., 512 F.3d 903, 906 & n.5 (7th Cir. 2008); Warren v. Barnhart, 2005 WL 1491012, at *9 & n.27 (E.D.Pa. June 22, 2005) (discussing in depth the definition of a substance use disorder under the DSM-IV).

determination of severity albeit this time determining whether plaintiff's physical and mental impairments were "severe" if she stopped abusing alcohol.  As to physical impairments, the ALJ found that, if plaintiff stopped using alcohol, she would still have the severe physical impairments of mild left knee degenerative joint disease and obesity and the nonsevere physical impairments of hypertension, ovarian cysts and a spinal disorder.  (Tr. 17-18).

The ALJ next looked at the four paragraph B functional areas to determine "the extent to which the claimant's mental limitations would remain if her alcohol abuse was stopped." (Tr. 18).  Examining and discussing the record, he concluded that plaintiff would have only mild limitation in activities of daily living, mild limitation in social functioning and mild limitation in concentration, persistence or pace, while experiencing no episodes of decompensation.  (Tr. 18-20).  The ALJ therefore changed his finding of marked limitations in the areas of social functioning and concentration, persistence or pace when plaintiff was using alcohol to mild limitations when plaintiff stopped using alcohol.[12]  In arriving at these

---

[12]  Plaintiff argues that the ALJ, based on his lay interpretation of the evidence, concluded that plaintiff's mental impairments were nonsevere in the absence of alcohol abuse even though he determined that the depression with alcohol abuse met listings 12.04 (affective disorder) and 12.09

determinations, the ALJ considered Dr. Gould's opinion that plaintiff had an anxiety disorder because the ALJ recited the finding at the outset of the discussion. (Tr. 17) ("Dr. Gould found the claimant has . . . an anxiety disorder").[13]

In the area of social functioning, the ALJ relied on opinions and findings by Dr. Hurd, Dr. Gould, Dr. Senger and Dr. Lender. Such a wide range of physicians evidences that the ALJ combed through and carefully considered the entire record. Dr. Hurd, who examined plaintiff at a time two weeks after plaintiff last used alcohol, noted that plaintiff "loses jobs when she calls in sick too often," "work becomes boring for her," "the novelty wears off" and she lacks motivation to go to work. (Tr. 265). The ALJ cited all of these findings in determining plaintiff's social functioning was mild. He additionally relied on the detailed notes and reasoning in the PRTF by Dr. Gould, who likewise recited and relied in part on the findings of Dr. Hurd. Dr. Gould classified plaintiff as having a mild

---

(substance addiction disorder). In other words, it is illogical to find that plaintiff had a depressive disorder that met listing 12.04 with alcohol abuse and then simultaneously conclude that the depression impairment was not even severe without alcohol abuse, according to plaintiff. A close comparison of the differences in the ALJ's findings is therefore warranted.

[13] Previously, when including her alcohol abuse, the ALJ determined that plaintiff had a "severe" anxiety disorder at step two.

limitation in the area of social functioning.  (Tr. 280).  As

discussed by the ALJ, Dr. Gould recognized that plaintiff has no

difficulty "attending meetings and appointments" and her

function report reflected that "she was depressed because she

could not find work."  (Tr. 19, 282).  Dr. Senger, as noted by

the ALJ, found that "plaintiff sees friends occasionally and her

mother frequently."  (Tr. 19, 362).  In fact, "she goes shopping

and out to dinner with her mother three times a week" and takes

the bus without difficulty, as stated by Dr. Senger and recited

by the ALJ in his decision vis-à-vis plaintiff's social

functioning without alcohol.  The ALJ also pointed out, as

supported in the record, that plaintiff "spends most of her time

helping" care "for her father, who has cancer."  (Tr. 19, 571).

The ALJ further noted Dr. Senger's positive description of

plaintiff as relating very well during the examination.[14]  The

ALJ found additional support for only a mild limitation from Dr.

Lender's notes.  These notes, cited and by and large quoted by

the ALJ, depict plaintiff's depression in 2012 as "improving"

---

[14]  Dr. Senger described plaintiff as "personable, pleasant,
engaging" and relating "easily and well here" with "good eye
contact."  (Tr. 363).  Dr. Hurd described plaintiff during his
December 2010 examination as "alert and cooperative" and as
maintaining eye contact and having an appropriate affect.  (Tr.
266).  Dr. Lender, plaintiff's treating psychiatrist, likewise
noted plaintiff's "good eye contact" throughout her treatment
notes.

and plaintiff as being "more active," "more motivated," "fairly groomed," "reliable," "compliant" and "relatively stable." (Tr. 19, 572, 576).

In the area of concentration, persistence or pace, which the ALJ also changed from a marked limitation when plaintiff was abusing alcohol to a mild limitation if plaintiff stopped her alcohol abuse, the ALJ relied on a wealth of evidence in the record, including opinions and findings by Dr. Gould, Dr. Senger, Dr. Hurd, Dr. Lender and Sheridan. Dr. Gould classified plaintiff as having a mild limitation in the area of concentration, persistence or pace. In lieu of simply checking a box, however, he addressed and supported the finding in section IV of the PRTF.[15] In arriving at the mild limitation, the ALJ relied and recited Dr. Gould's findings that plaintiff "has no difficulty driving an automobile, attending her meetings and appointments, maintaining her home and performing household chores," a level of activity and functioning that suggested "she has the concentration, attention, focus and persistence needed for work-related activities," as stated by the ALJ in repeating Dr. Gould's findings.[16] (Tr. 19, 282). Dr. Senger likewise

---

[15] As previously noted, regulations afford greater weight to an opinion that provides an explanation. See 20 C.F.R. § 404.1527(c)(3), (e); 20 C.F.R. § 416.927(c)(3), (e).

[16] The ALJ included various work related findings in discussing the nonsevere mental limitations relative to the paragraph B

reported "full self care," shopping and chores, as noted by the ALJ. (Tr. 19, 363). Like Dr. Hurd, who scored plaintiff as 30 out of 30 on mini-mental status examination at a time when she had not used alcohol for the last two weeks (Tr. 265-266), Dr. Senger scored plaintiff as a perfect 30 on the same examination, as noted by the ALJ (Tr. 20, 363). Dr. Senger found that plaintiff had the ability to "comprehend, remember, and carry out instructions," a finding relied upon the ALJ. The ALJ additionally recognized that plaintiff had a college degree and "was working fairly regularly" and, for support, cited this finding by Dr. Senger. In the same sentence, Dr. Senger added the caveat that plaintiff had worked "fairly regularly, except for getting fired for alcoholism three times over the years." (Tr. 19, 363). In addition, the ALJ again relied on Dr. Lender's notes that describe plaintiff's depression as "improving" and plaintiff as "more active," "motivated, compliant, and relatively stable." (Tr. 19, 572, 576).

In light of these opinions and findings, the ALJ determined that plaintiff's mental limitations were nonsevere if plaintiff stopped abusing alcohol. Thereafter, he incorporated all of the foregoing paragraph B findings and analysis made if plaintiff

criteria. Thereafter, he incorporated the paragraph B mental limitations and findings without alcohol abuse into an RFC assessment if plaintiff stopped the alcohol abuse. (Tr. 18-20).

stopped her alcohol abuse into the residual functional capacity ("RFC") plaintiff would have if she stopped the alcohol abuse. (Tr. 20). Before outlining the RFC, the ALJ determined that plaintiff would have no impairment or combination of impairments that met or medically equaled any listing in Appendix 1, Subpart P, Part 404 of the Code of Federal Regulations if she stopped her alcohol use. (Tr. 20).

The ALJ then proceeded to determine plaintiff's RFC if she "stopped her alcohol abuse." (Tr. 20). He found plaintiff had the RFC "to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.957(a) except for the following limitations and restrictions: she can occasionally climb, balance, stoop, kneel, crouch or crawl; she can occasionally push foot controls with her left lower extremity; and she should avoid hazards, such as machinery and heights." (Tr. 20). Sedentary work is defined as involving:

> lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. §§ 404.1567(a) & 416.967(a).

In arriving at the above RFC, the ALJ considered the mental impairment of depression because he stated that the RFC "reflects the degree of limitation I have found in the

'paragraph B' mental function analysis." (Tr. 20). As noted above, the significant changes from the step three paragraph B findings with alcohol abuse and the RFC findings without alcohol abuse were the rating changes from "marked" to "mild" for social functioning and concentration, persistence or pace. As framed, the above RFC if plaintiff stopped abusing alcohol does not include any nonexertional, mental limitations.

The ALJ wrote that in arriving at the RFC decision, he gave "great weight" to the "treating source" opinion of Dr. Zarins "to show that the claimant is capable of performing a range of sedentary level work, with limitations."[17] (Tr. 21). He also gave the findings of Dr. Kriston "great weight" to show the same. The ALJ explained that he gave the findings of the state welfare agency "little weight, as the standards applied by the state agency are not the same used by Social Security."[18] (Tr. 21).

He also addressed the major depressive disorder found by Dr. Lender. (Tr. 22). The ALJ gave the October 2012 opinion of Dr. Lender, a treating psychiatrist, that plaintiff had "several

_____

[17] As previously noted, Dr. Zarins opined that plaintiff is capable of "performing a range of sedentary level work, with limitations." (Tr. 21).
[18] The determination was appropriate. See generally McDonough v. U.S. Social Security Administration, Acting Commissioner, 2014 WL 2815782, at *13 (D.N.H. June 23, 2014) ("'state determination is not, in and of itself, evidence of disability'").

markedly limited work-related functional limitations, little

weight." (Tr. 22, 569-570). He rejected the opinion because

Dr. Lender's treating notes were "inconsistent with such

disabling limitations."[19] (Tr. 22).

The ALJ also afforded "little weight" to the opinions of

Pransky, who treated plaintiff sporadically between 1993 and

2000, and Dr. Gardos, who last treated plaintiff in 1999, given

the "lack of time relevance." (Tr. 13). Pransky and Dr. Gardos

each diagnosed plaintiff as having a dysthymic disorder and

PTSD. The ALJ explained that Dr. Gardos last saw plaintiff

almost a decade before the August 2009 onset date. Similarly,

the ALJ pointed out that Pransky saw plaintiff only once in the

past ten years. Although both Dr. Gardos and Pransky are former

treating sources, neither medical source had a longitudinal

picture of plaintiff's recent and disabling impairments. See 20

C.F.R. §§ 416.927(c) & 404.1527(c) ("the longer a treating

source has treated you and the more times you have been seen by

---

[19]  Plaintiff submits that the ALJ erred by rejecting the
treating source opinion of Dr. Lender in concluding that
plaintiff's alcohol abuse was a material contributing factor and
that, absent alcohol abuse, plaintiff's depressive disorder was
not disabling. Plaintiff asserts that substantial evidence is
lacking because no medical evidence supports the ALJ's
conclusion that plaintiff's mental impairments without alcohol
abuse were nonsevere. In particular, Dr. Lender's diagnosis of
a major depressive disorder and marked limitations in work
related functions (Tr. 569-570) directly contradicted the ALJ's
RFC that plaintiff had no mental impairments in the absence of
alcohol, according to plaintiff.

a treating source, the more weight we will give to the source's medical opinion"). Dr. Lender, plaintiff's current treating psychiatrist, did not diagnose plaintiff as having PTSD or any other type of anxiety disorder. In light of the above, the ALJ's decision to discount the PTSD diagnoses by Dr. Gardos and Pransky was appropriate. See 20 C.F.R. §§ 416.927(c)(4) & 404.1527(c)(4).

The ALJ found plaintiff "less than fully credible." (Tr. 22-23). He found her "statements concerning the intensity, persistence and limiting effects of her symptoms are not fully credible to the extent they are inconsistent with the residual functional capacity assessment."[20] (Tr. 23).

Applying the RFC, the ALJ determined at step four that if plaintiff "stopped her alcohol abuse, she would be able to perform her past relevant work as a secretary," which was "a skilled, sedentary job." (Tr. 23). The ALJ found that, "This work does not require the performance of work-related activities precluded by her residual functional capacity that she would have if she stopped her alcohol abuse." (Tr. 23-24).

A.  Materiality and RFC

---

[20]  Wisely, plaintiff does not challenge the ALJ's thorough and well supported discussion and determination as to her credibility. (Tr. 22-23).

Plaintiff maintains that the ALJ's determination that plaintiff's alcohol abuse was material to the finding of disability was not supported by substantial evidence. (Docket Entry ## 16, 24). Plaintiff submits that the record does not contain "any medical opinion that expressed the conclusion that Plaintiff would have no mental limitation in the absence of "alcohol abuse." (Docket Entry # 16, p. 4). Instead, all of the opinions addressed plaintiff's limitations with alcohol abuse. Plaintiff further contends that the ALJ ignored the finding that plaintiff's anxiety was a severe impairment at step two and the depressive disorder with alcohol abuse at step three when he determined that the depression, without alcohol abuse, was only a nonsevere mental impairment. Plaintiff asserts that none of the medical opinions in the record addressed what mental limitations would remain from the severe anxiety and the depressive disorder (listing 12.04) if plaintiff stopped the alcohol abuse.

Plaintiff further argues that the ALJ's RFC finding that plaintiff had no mental limitations related to her anxiety or depression if she stopped using alcohol lacked substantial evidence. Plaintiff notes, correctly, that Dr. Gould, Dr. Hurd and Dr. Senger's opinions were all based on plaintiff's mental impairments and limitations with alcohol use. According to plaintiff, there was no medical evidence or opinion assessing

her RFC functional limitations without alcohol use.  Plaintiff
also points out that Dr. Lender's medical source statement
outlining the markedly limited work related qualities "did not
even mention" alcohol abuse.  (Docket Entry # 16).  The ALJ's
erroneous determination that the depression was nonsevere
without alcohol use (previously determined to meet listing 12.04
with alcohol abuse) and the failure to consider her anxiety
(previously determined "severe" with alcohol use) led to the
flawed RFC assessment without alcohol use and a lay
interpretation of the medical evidence, according to plaintiff.
(Docket Entry ## 16, 24).

In addition, plaintiff cites to Social Security Ruling 13-
2p, 2013 WL 621536 (Feb. 20, 2013) ("SSR 13-2p"), for the
premise that alcohol abuse is not material when "there is no
medical evidence that establishes that the alcohol abuse results
in marked limitations."  (Docket Entry # 24, p. 2) (Docket Entry
# 15, p. 5).  The express language of SSR 13-2p does not contain
this requirement.  Plaintiff additionally points out, correctly,
that SSR 13-2p requires evidence to establish "'that a claimant
with a co-occurring mental disorder(s) would not be disabled in
the absence of DAA.'" (Docket Entry # 16) (quoting SSR 13-2p,
2013 WL 621536, at *9).  Defendant argues that the ruling does
not apply because it took effect on March 22, 2013, several
months after the ALJ's November 2012 decision.  Defendant also

submits that the ALJ's decision is not inconsistent with SSR 13-2p.

Defendant maintains that substantial evidence supports the ALJ's determination that plaintiff's mental impairments would not be "severe" in the absence of alcohol abuse. (Docket Entry # 22, p. 11). To that end, defendant cites the medical evaluations by Dr. Gould, Dr. Davidson[NL1], Dr. Hurd, and Dr. Senger to show that plaintiff had only mild limitations in the paragraph B categories of mental functioning. The opinions of Dr. Gould, Dr. Hurd, Dr. Senger and Dr. Davidson are also consistent with the ultimate conclusion that plaintiff is not disabled, according to defendant. (Docket Entry # 22[NL2]).

In 1996, Congress amended the Social Security Act to deny disability benefits to an individual if it is found that his or her "alcoholism or drug addiction" is a "material contributing factor to the disability determination." 42 U.S.C. § 423(d)(2)(C).[21] Under the statute, if a claimant is determined to be disabled and there is medical evidence of drug or alcohol

_____

[21] The statute provides:

> An individual shall not be considered to be disabled for purposes of this subchapter if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled.

42 U.S.C. § 423(d)(2)(C).

abuse, then the ALJ "must go one step further" and make a finding regarding the materiality of the drug or alcohol abuse to the finding of disability.  Brown v. Apfel, 71 F.Supp.2d 28, 35 (D.R.I. 1999).  In determining whether or not an individual's substance abuse is material to the determination of disability, the "key factor" is if an individual would still be found to be disabled if she "stopped using drugs or alcohol."  20 C.F.R. §§ 404.1535(b)(1) & 416.935(b)(1); Brown v. Apfel, 71 F.Supp.2d at 35.

In adjudicating the materiality of a claimant's alcohol or substance abuse, the applicable regulations require the ALJ to determine "which of [the claimant's] current physical and mental limitations . . . would remain if [the claimant] stopped using drugs or alcohol."  20 C.F.R. §§ 404.1535(b)(2) & 416.935(b)(2). Next, the ALJ must "then determine whether any or all of [claimant's] remaining limitations would be disabling."  20 C.F.R. §§ 404.1535(b)(2) & 416.935(b)(2).  Overall, if in the absence of drug or alcohol abuse the claimant would be determined not to be disabled, then claimant's alcohol or drug abuse is material; however, if claimant would still be considered disabled even if he or she stopped using drugs or alcohol, then the substance use will be deemed not material.  20 C.F.R. §§ 404.1535(b)(2) & 416.935(b)(2); see Cage v. Comm'r of Social Security, 692 F.3d 118, 123 (2nd Cir. 2012); Brueggemann

v. Barnhart, 348 F.3d 689, 693 (8th Cir. 2003); Frazier v. Astrue, 2010 WL 5866215, at *6 (D.Mass. Feb. 22, 2010).

"The question of materiality of drug addiction or alcoholism is reserved to the Commissioner." Velazquez v. Astrue, 2013 WL 1415657, *11 (D.R.I. Feb. 22, 2013); accord SSR 13-2p, 2013 WL 621536, at *16 ("[t]he finding about materiality is an opinion on an issue reserved to the Commissioner"). The claimant bears the burden of proving his or her alcohol abuse is not a material factor contributing to the determination of disability. See Cage v. Comm'r of Social Security, 692 F.3d at 123; Brueggemann v. Barnhart, 348 F.3d at 693; Frazier v. Astrue, 2010 WL 5866215, at *6 ("[t]he burden of proving alcoholism was not a contributing factor to the disability falls on [plaintiff]"); see also SSR 13-2p, 2013 WL 621536, at *4 (plaintiff "continues to have the burden of proving disability throughout the drug addiction or alcoholism materiality analysis").

Substantial evidence must support all of the ALJ's findings through all stages of the disability determination. See Manso-Pizarro v. Sec'y of Health and Human Services, 76 F.3d at 16; Evangelista v. Sec'y of Health and Human Services, 826 F.2d 136, 144 (1st Cir. 1987). Considering this consistent requirement, it would be illogical for the determination of drug or alcohol abuse ("DAA") materiality and plaintiff's projected RFC in the

absence of drug or alcohol abuse not to be subject to the same standard.  See Brueggemann v. Barnhart, 348 F.3d at 695 ("[e]ven though the task is difficult, the ALJ must develop a full and fair record and support his conclusion with substantial evidence on this point just as he would on any other"); see also Cage v. Comm'r of Social Security, 692 F.3d at 126-127 (finding "substantial evidence" to support "ALJ's determination that Cage would not be disabled were she to discontinue her drug and alcohol abuse").

Medical evidence to support a finding that claimant would not be disabled absent drug or alcohol abuse can be gathered from a period or periods of abstinence through observations and medical findings about what "impairment-related limitations remained after the acute effects of drug and alcohol use abated."  SSR 13-2p, 2013 WL 621536, at *12; see Velazquez v. Astrue, 2013 WL 1415657, at *11; Evans v. Astrue, 2012 WL 4482354, at *1-2 (D.R.I. Sept. 26, 2012).  Where "the claimant never achieves sobriety, the materiality determination will necessarily be hypothetical and therefore more difficult, but the claimant cannot avoid a finding of no disability simply by continuing substance abuse."  Velazquez v. Astrue, 2013 WL 1415657, at *11; see Brueggemann v. Barnhart, 348 F.3d at 695 ("when the claimant is actively abusing alcohol or drugs, this determination will necessarily be hypothetical and therefore

more difficult than the same task when the claimant has stopped"); Evans v. Astrue, 2012 WL 4482354, at *2.

In the case at bar, plaintiff does *not* argue that there must be a period of abstinence to find materiality thereby waiving any such contention. See Coons v. Industrial Knife Co., Inc., 620 F.3d at 44. Rather, plaintiff insists that there is no evidence, including no medical opinion, that assesses and determines plaintiff's remaining mental limitations and impairments without alcohol abuse. The ALJ's reliance on the opinions assessing both her depression and her alcohol abuse fails to address this issue and therefore does not provide substantial evidence for the ALJ's materiality finding, according to plaintiff. In addition, where, as here, there is a co-occurring mental disorder, namely, an affective disorder of depression, plaintiff insists there must be evidence that she would not be disabled in the absence of DAA. (Docket Entry # 16, p. 8) (quoting SSR 13-2p, 2013 WL 621536, at *9).

Substantial evidence to support the materiality finding is required. See Cage v. Comm'r of Social Security, 692 F.3d at 126-127; Brueggemann v. Barnhart, 348 F.3d at 695. The Second Circuit in Cage rejected an argument strikingly similar to plaintiff's argument that there can be no materiality finding unless there is a medical opinion that separates and addresses what limitations remain without alcohol use. See Cage v. Comm'r

of Social Security, 692 F.3d at 126.  The facts in Cage are also
strikingly similar to those in the case at bar.[22]  Cage initially
argued that "'an ALJ cannot find that drug or alcohol use is a
contributing factor where there is no medical opinion addressing
the issue.'"  Id.  The Second Circuit rejected the argument
because "such a rule, found nowhere in the U.S.Code or C.F.R.,
is unsound."  Id.  The court reasoned that any such rule "would
unnecessarily hamper ALJs and impede the efficient disposition
of applications in circumstances that demonstrate DAA

---

[22]  Cage suffered from a variety of mental conditions including
drug and alcohol abuse.  Id. at 120, 127.  The ALJ in Cage:

> made the following pertinent findings:  At step three, he
> determined that Cage was per se disabled under Listings
> 12.04 (affective disorder), 12.08 (personality disorder)
> and 12.09 (substance addiction disorder).  See 20 C.F.R.
> pt. 404, subpt. P, app. 1 (setting forth the Listings).
> Each of those Listings required findings that Cage suffered
> from two of the four so-called "Paragraph B" symptoms.  The
> ALJ made such findings, concluding that Cage suffered
> marked difficulties in social functioning and with regard
> to concentration, persistence or pace.  The ALJ then found
> that, in the absence of DAA, Cage would only suffer
> moderate difficulties in those respects.  With this
> improvement, Cage would no longer qualify as per se
> disabled under the Listings, so the ALJ proceeded to steps
> four and five.  Based on the testimony of a vocational
> expert, the ALJ found that Cage's impairments in the
> absence of DAA would allow her to work.

Id. at 126.  The court in Cage identified the determinative
issue as "the ALJ's findings that Cage's difficulties with
social functioning, and with concentration, persistence and
pace, would improve from 'marked' to 'moderate' in the absence
of DAA."  Id.  Undertaking pleanary review of the administrative
record, the court "conclude[d] that those findings were
supported by substantial evidence."  Id.

materiality in the absence of predictive opinions." Id.
(collecting case law).

Here too, requiring a predictive opinion to determine
materiality or a medical opinion that separates the alcohol use
from the remaining limitations deprives the ALJ of the
flexibility needed to address DAA materiality.  It is also not
required by the regulations or even the subsequently issued SSR
13-2p.  Moreover, disability determinations are made on the
whole record as opposed to a record that must contain a
particular predictive opinion.  See Stanley v. Colvin, 2014 WL
1281451, at *13 (D.Mass. March 28, 2014) (noting that "an ALJ's
decision must be based upon a consideration of the entire
record" although he "'can consider all the evidence without
directly addressing in his written decision every piece of
evidence submitted by a party'").

The dispositive inquiry is whether substantial evidence
supports the materiality finding and, in particular, the ALJ's
critical findings changing from marked to mild the social
functioning and the concentration, persistence or pace function
when plaintiff no longer abused alcohol.  See Cage v. Comm'r of
Social Security, 692 F.3d at 126-127; see also Seavey v.
Barnhart, 276 F.3d at 9 (review entails "whether the final
decision is supported by substantial evidence and whether the
correct legal standard was used").  In other words, as

appropriately framed by the Second Circuit in Cage under

analogous circumstances, "Was the ALJ's finding of DAA

materiality supported by substantial evidence, notwithstanding

the lack of a consultive opinion predicting [plaintiff's]

impairments in the absence of . . . alcohol abuse?"  Cage v.

Comm'r of Social Security, 692 F.3d at 126.  The same question

inures here regarding whether the ALJ's finding of DAA

materiality is supported by substantial evidence,

notwithstanding the lack of a medical opinion that separates the

alcohol abuse from the remaining limitations and renders a

finding.

Although there was no extended period of sobriety, Dr. Hurd

examined plaintiff at a time when she had not used alcohol in

the prior two weeks, a fact noted by the ALJ.  See SSR 13-2p,

2013 WL 621536, at *16 n.27 (recognizing that there is no set

time period for abstinence although "claimant should be

abstinent long enough to allow the acute effects of drug or

alcohol use to abate"); Cage v. Comm'r of Social Security, 692

F.3d at 127 (although "record does not reveal any extended

periods of sobriety . . . it does include, inter alia, positive

evaluations of Cage conducted during inpatient admissions when

Cage did not have access to drugs or alcohol").  Plaintiff

scored a 30 out of 30 on the mental status exam during this time

period, made good eye contact and had an appropriate mood and

affect. (Tr. 266). Dr. Senger made the same findings nine months later in September 2011. He also noted that plaintiff had the ability to comprehend, remember and carry out instructions. (Tr. 363-364). Plaintiff admitted to being an alcoholic. Dr. Gould found plaintiff could attend meetings and appointments and possessed a level of functioning that suggested she had the "concentration, attention, focus and persistence for work-related activities." (Tr. 282). He rated plaintiff's activities of daily living, social functioning and concentration, persistence or pace as mild. Dr. Lender's treatment notes over a seven month period in 2012 reflect plaintiff's improving depression, good eye contact, a more active and more motivated condition and a clear and organized thought process. Whereas at times Dr. Lender described plaintiff as sad, Dr. Lender also described her as "reliable, motivated and compliant." (Tr. 572, 576-581). The ALJ cited and relied upon all of these as well as other findings to determine that the paragraph B criteria rendered plaintiff's mental limitations without alcohol abuse "mild."

Accordingly, the ALJ did not ignore the depressive disorder with the alcohol abuse use that he found at step three. Rather, he considered the symptoms of plaintiff's depression and arrived at a finding that is supported by substantial evidence. Further, the step three depressive disorder with alcohol abuse

heavily relied on plaintiff's symptoms of alcohol use. (Tr. 15-17).

Incorporating the paragraph B analysis into the RFC determination (Tr. 20), the ALJ relied on the same evidence and findings and added additional findings, also supported in the record. Substantial evidence therefore exists for the ALJ's materiality finding.

Indeed, the court in Cage found similar and, indeed, not as strong, evidence sufficient to amount to substantial evidence to uphold the DAA materiality finding. See id. at 127. The court also rejected plaintiff's argument that "a predictive medical opinion is necessary in cases, including hers, in which '"it is not possible for an ALJ to separate the limitations imposed by substance abuse [and] by other non-DAA impairments."'" Id. at 126.

Plaintiff's reliance on SSR 13-2p that evidence establishing "that a claimant with a co-occurring mental disorder(s) would not be disabled in the absence of DAA," SSR 13-2p, 2013 WL 621536, at *9, does not advance her case. The foregoing evidence and the other additional evidence relied upon by the ALJ provides substantial evidence that plaintiff would not be disabled absent DAA. In the same section of SSR 13-2p, 2013 WL 621536, at *9, the ruling instructs that, "DAA is not material to the determination of disability . . . if the record

is fully developed and the evidence does not establish that the claimant's co-occurring mental disorder(s) would *improve* to the point of nondisability in the absence of DAA." Id. (emphasis added). In the case at bar, the ALJ repeatedly noted and emphasized that plaintiff's depression was "improving" even with a diagnosed alcohol dependence as set out in the treatment notes of Dr. Lender, plaintiff's treating psychiatrist.

Plaintiff next submits that the RFC lacked substantial evidence. Plaintiff also relies on Dr. Lender's findings of marked limitations in the medical source statement and points out that Dr. Lender made the findings without mentioning plaintiff's alcohol dependence or abuse.

An RFC determination must be based on "all the relevant medical and other evidence" in the case record and it reflects the most a claimant can do despite his or her limitations. 20 C.F.R. §§ 404.1545(a)(1) & 416.945(a)(1). The ALJ, as a lay person, is "not qualified to interpret raw medical data in functional terms." Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999); see Berrios Lopez v. Secretary of Health & Human Services, 951 F.2d 427, 430 (1st Cir. 1991) ("ALJ is not qualified to assess claimant's residual functional capacity based on the bare medical record"). Rather, "'an expert's RFC evaluation is ordinarily essential unless the extent of functional loss, and its effect on job performance, would be

apparent even to a lay person.'" Manso-Pizarro, 76 F.3d at 17

(quoting Santiago v. Secretary of Health and Human Services, 944

F.2d 1, 7 (1st Cir. 1991)).

As explained above, however, the ALJ relied on the

functional limitations found by Dr. Gould as well as the

opinions and findings by Dr. Senger, Dr. Hurd and Dr. Lender's

treatment notes.  The ALJ justifiably rejected Dr. Lender's

medical source statement regarding the marked limitations in

work related qualities.  As to the latter, it is well settled

that the medical opinion of a treating source is entitled to

controlling weight when it "is well-supported by medically

acceptable clinical and laboratory diagnostic techniques and is

not inconsistent with the other substantial evidence in [the]

case record."  20 C.F.R. § 416.927(c)(2); Gordils v. Secretary

of Health and Human Servs., 921 F.2d 327, 328-329 (1st Cir. 1990)

"If the opinion is inconsistent, however, either internally or

with other evidence, the [ALJ] is free to 'downplay' the

physician's assessment." Rodriguez v. Astrue, 694 F.Supp.2d 36,

42 (D.Mass. 2011) (quoting Arruda v. Barnhart, 314 F.Supp.2d 52,

72 (D.Mass. 2004)).  Further, if the ALJ decides to discount the

opinion of a treating source, he also "must consider the length,

nature, and extent of the treatment relationship." Taylor v.

Astrue, 899 F.Supp.2d 83, 87 (D.Mass. 2012).  "Regardless of

whether or not the [ALJ] decides to discount the treating

physician's opinion, the decision 'must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record.'" Id. (quoting Social Security Ruling 96-2p, 1996 WL 374188, at *5 (July 2, 1996)).

Here, the ALJ gave Dr. Lender's findings in the medical source statement "little weight." (Tr. 22). He rejected the opinion because "the treating notes of Dr. Lender are inconsistent with such mentally disabling limitations." (Tr. 22). As noted above, the ALJ fully discussed the inconsistencies between Dr. Lender's medical source statement and her treatment notes.

Having given Dr. Lender's medical source statement little weight, the ALJ relied on Dr. Lender's treatment notes and the findings and opinions by Dr. Gould, Dr. Senger and Dr. Hurd. As noted, Dr. Gould's PRTF findings were explicit and he provided a detailed explanation. Dr. Senger, an examining medical source, also made certain findings regarding plaintiff's ability to perform work related functions.

An RFC prepared by a non-examining, non-testifying physician "is entitled to some evidentiary weight, which 'will vary with the circumstances, including the nature of the illness and the information provided the expert.'" Berrios Lopez v. Secretary of Health & Human Services, 951 F.2d at 431 (quoting

Rodriguez v. Secretary of Health and Human Services, 647 F.2d at
223); accord Gordils v. Secretary of Health and Human Services,
921 F.2d at 328. Hence, the findings of a non-examining
physician may constitute substantial evidence when the report
includes more than "brief conclusory statements or the mere
checking of boxes denoting levels of residual functional
capacity" and indicates "some care" in reviewing the medical
file. Berrios Lopez v. Secretary of Health & Human Services,
951 F.2d at 431. As explained in the relevant regulations, "The
better an explanation a source provides for an opinion, the more
weight we will give that opinion." 20 C.F.R. § 404.1527(c)(3),
(e); 20 C.F.R. § 416.927(c)(3), (e).

Here, the ALJ relied on inter alia the findings and
opinions by Dr. Gould, Dr. Senger, Dr. Hurd and the treatment
notes of Dr. Lender. In light of Dr. Gould's relatively
detailed PRTF, Dr. Senger's detailed report and testing, Dr.
Hurd's consistent findings and Dr. Lender's treatment notes,
substantial evidence supported the ALJ's RFC. Plaintiff fails
in her burden to establish DAA materiality.[23]

---

[23] To the extent that particular findings of plaintiff's
functional limitations by Dr. Hurd, Dr. Senger and Dr. Gould
relied upon by the ALJ included assessments of plaintiff's
depression and mental impairments with alcohol use, such
findings necessarily encompass findings that plaintiff would
have no *more* than the same limitations if she did not abuse
alcohol.

Indeed, the First Circuit's opinion in Silva-Valentin v. Commissioner of Social Security, 2003 WL 22114475 (Sept. 11, 2003) (unpublished), upheld an ALJ who relied on somewhat similar evidence to reject a treating psychiatrist's opinion of a disabling condition as inconsistent with other substantial evidence.[24] The other substantial evidence consisted primarily of an "examination of claimant by Dr. Tejeda and [an] RFC assessment completed by [a] non-examining physician." Id. at *1-2. Those reports:

> indicated that, at most, claimant had moderate difficulties in concentrating, but that, at a minimum, her thought processes were intact, and she retained the ability to engage in simple work. Combined with [the treating psychiatrist's] own observation that claimant's intellectual functioning was fair, it would be difficult to say that the ALJ erred in not giving controlling weight to the opinion of [the treating psychiatrist] that claimant was disabled.

Id. at *2. The above noted similar findings regarding plaintiff's mild functional limitations, improving depression, normal test results and Dr. Lender's treatment notes similarly provide substantial evidence for the ALJ's RFC. Given this substantial evidence, the absence of an RFC assessment of

---

[24] As an unpublished opinion, this court considers the opinion for its persuasive value but not as precedent. See LR. 32.1.0, United States Court of Appeals for the First Circuit.

plaintiff that separates her alcohol use and does not consider it fails to yield a finding of non-materiality.

Plaintiff additionally maintains that the ALJ's RFC determination without alcohol abuse ignored the severe anxiety impairment the ALJ found at step two when including the alcohol abuse. Plaintiff submits that after finding a severe anxiety impairment at step two, the ALJ did not address or consider the anxiety impairment at any subsequent point in the decision. Plaintiff also contends that the ALJ erred at step three because he "ignored Plaintiff's anxiety disorder, which he already found was severe" at step two.[25]  (Docket Entry # 16, p. 2).

First, plaintiff misconstrues the record because the ALJ summarized Dr. Gould's diagnosis of the anxiety disorder when he found that the anxiety impairment was severe at step two with alcohol use and again when he found that plaintiff's remaining mental impairments without alcohol abuse were not severe.  (Tr.

---

[25]  Plaintiff's supporting memorandum makes a brief statement that, "[T]he ALJ did not consider Plaintiff's other medically diagnosed impairments," namely, her ADD and her personality disorder.  (Docket Entry # 16, p. 2).  Plaintiff does not refer to the failure elsewhere in the supporting memorandum or anywhere in the reply brief.  Plaintiff also does not cite to any law to support the purported error.  The argument is therefore waived.  See Coons v. Industrial Knife Co., Inc., 620 F.3d 38, 44 (1st Cir. 2010) ("district court was 'free to disregard' the state law argument that was not developed in Coons's brief").

13, 17).  He then incorporated those findings into the RFC.
(Tr. 13, 17, 20).

Second, "The determination at step two as to whether an
impairment is severe is a de minimis test, designed to 'screen
out groundless claims.'"  Hines v. Astrue, 2012 WL 2752192, at
*9 (D.N.H. July 9, 2012) (quoting McDonald v. Secretary of
Health & Human Services, 795 F.2d 1118, 1123 (1st Cir. 1986)).
Consequently, "An ALJ's finding that an impairment is severe
does not necessarily translate into functional restrictions in
the RFC."  Id.; accord Griffeth v. Commissioner of Social
Security, 2007 WL 444808, at *3 (6th Cir. Feb. 9, 2007) (ALJ's
finding at step two that limitation was more than minimal "was
not inherently inconsistent with his finding that the limitation
has 'little effect' on the claimant's ability to perform basic
work related activities") (unpublished); Lacroix v. Barnhart,
465 F.3d 881, 888 n.3 (8th Cir. 2006) (summarily rejecting
claimant's argument that ALJ failed to include step two
limitations of severe mental impairment in RFC); Sykes v. Apfel,
228 F.3d 259, 268 n.12 (3rd Cir. 2000) ("finding under step two
of the regulations that a claimant has a 'severe' nonexertional
limitation is not the same as a finding that the nonexertional
limitation affects residual functional capacity").

The ALJ considered the anxiety disorder diagnosed by Dr.
Gould but found, also based on Dr. Gould's findings, that

plaintiff could engage in various activities, including driving, attending appointments, maintaining her home and performing household chores. (Tr. 17). Thus, recognizing and citing the anxiety disorder diagnosed by Dr. Gould, in the same paragraph the ALJ discussed the functioning capabilities noted by Dr. Gould, including his finding that plaintiff "has the concentration, attention, focus and persistence needed for work-related activities." (Tr. 17, 282).

With respect to the paragraph B findings, the ALJ cited and relied on these same functioning capabilities found by Dr. Gould when the ALJ determined that plaintiff had only mild limitations in social functioning and concentration, persistence or pace. (Tr. 19). The ALJ then carried over the limitations he "found in the 'paragraph B' mental function analysis" in his assessment of plaintiff's RFC. (Tr. 20) ("the following [RFC] reflects the degree of limitation I have found in the 'paragraph B' mental function analysis"). Accordingly, the ALJ considered the functional capabilities of plaintiff in light of her anxiety disorder in crafting the RFC. There was no error let alone an error that was not harmless.[26]

---

[26] Any failure to consider the anxiety disorder at step three was harmless because the ALJ found that the depression, including the alcohol abuse, was disabling on the basis and accordingly proceeded to consider the materiality of the DAA. Thus, if the ALJ had considered the anxiety impairment at step

B.  Step Four

Plaintiff next challenges the ALJ's findings at step four.
In addition to the above deficiencies of the RFC which led to a
"seriously flawed Step 4 finding," plaintiff submits that the
ALJ did not comply with SSR 82-62.  (Docket Entry # 16).
Specifically, the ALJ failed to develop and explain the physical
and mental demands of plaintiff's past relevant work as a
secretary.  Plaintiff further points out that the step four
finding was not "supported by testimony from a vocational
expert."  (Docket Entry # 16).

Defendant contends that substantial evidence supports the
ALJ's step four determination.  Defendant submits that because
the ALJ determined that plaintiff had no severe mental
impairments, it logically follows that the ALJ did not have to
include mental limitations in the RFC assessment.  The ALJ then
justifiably concluded that plaintiff had the RFC to perform her
past work as a secretary.  Defendant also asserts that a
vocational expert ("VE") is not required.  (Docket Entry # 22).

Plaintiff maintains that the ALJ made no findings vis-à-vis
the second component and cursory findings as to the first and

_____

three, the result would lead to the same conclusion of a
disability at step three and a resulting consideration of DAA
materiality.  In considering DAA materiality, the ALJ considered
Dr. Gould's diagnosis of an anxiety disorder and the
accompanying symptoms.

third components.  Rather, the ALJ simply and summarily stated that plaintiff "would be able to perform her past relevant work as a secretary, as this work is actually and generally performed."  (Tr. 24) (Docket Entry # 24, p. 10) (Docket Entry # 16, p. 9).

SSR 82-62 provides that the ALJ must develop and fully explain whether the claimant has the RFC to perform her past relevant work.  SSR 82-62, 1982 WL 31386, at *3 ("[t]he decision as to whether the claimant retains the functional capacity to perform past work . . . must be developed and explained fully in the disability decision").  The ruling requires the ALJ to make findings regarding:  (1) the claimant's RFC; (2) "the physical and mental demands of the past" relevant job or occupation; and (3) whether the claimant's "RFC would permit a return to his or her past job or occupation."  SSR 82-62, 1982 WL 31386, at *4.  With respect to the second component of the analysis, "the ALJ's 'determination or decision must contain among the findings' a specific finding of fact 'as to the physical and mental demands of the past job/occupation.'"  Waters v. Colvin, 2014 WL 898639, at *3 (D.N.H. March 7, 2014) (quoting SSR 82-62, 1982 WL 31386, at *3-4).  Under this component, the ALJ must make findings regarding whether the claimant "retains the RFC to perform 'the actual functional demands and job duties of a particular past relevant job.'"  Santiago v. Secretary of Health and Human

Services, 944 F.2d 1, 5 (1st Cir. 1991). If the claimant cannot perform the demands of the particular job performed in the past, a finding of non-disability may still follow "if the claimant has the capacity to meet the functional demands of that occupation as customarily required in the national economy." Id. at 5 n.1.

In the case at bar, the ALJ did not develop or explain, let alone fully explain, the demands of the particular job of a secretary that plaintiff performed in the past. He also failed to explain the demands of the occupation in the national economy. Although the ALJ classified plaintiff's past work as a secretary as "a sedentary, skilled job" and cited support for the finding (Tr. 23, 143, 234), he did not analyze the demands of that job and then compare it to plaintiff's current functional capabilities. See Manso- Pizarro v. Secretary of Health and Human Services, 76 F.3d 15, 17 (1st Cir. 1996) (at step four, "ALJ must compare the physical and mental demands of that past work with current functional capability"). Rather, he made the following, conclusory statement:

In comparing the residual functional capacity that the claimant would have if she stopped her alcohol abuse, with the physical and mental demands of her past relevant work as a *secretary* (Ex. 3E & 22E). [sic] Therefore, I find that the claimant would be able to perform her past relevant work as a secretary, as it [sic] this work is actually and generally performed.

(Tr. 24) (punctuation and italics in original).  Accordingly,
the ALJ did not develop or provide a full explanation or
specific findings about the physical and mental demands of
plaintiff's past job as a secretary or, alternatively, the
demands of the occupation as performed in the national economy
and then compare those demands with her functional capabilities
in the RFC.  The error was not harmless.  See, e.g., Gerhard v.
Colvin, 2015 WL 431636, at *5 (W.D.Okla. Jan. 29, 2015) (step
four violation of SSR 82-62 was not harmless).  The ALJ's
decision at step four in determining that plaintiff would be
able to perform her past work as a secretary (Tr. 23, ¶ 8) was
both a legal error because it did not comply with SSR 82-62 and
this court cannot ascertain whether the ALJ had substantial
evidence to support it.

    Although plaintiff summarily requests "a new administrative
hearing," such a hearing is not required in the case at bar.
See Keating v. Secretary of Health and Human Services, 848 F.2d
271, 274 (1st Cir. 1988) (upholding ALJ's decision on remand not
to hold another hearing).  Whether to conduct such a hearing is
left to the discretion of the Commissioner.  See generally
Seavey v. Barnhart, 276 F.3d at 13 (discussing sentence four
remand and "leav[ing] the question of additional evidence to the
discretion of the ALJ").

A sentence four remand is appropriate in the event the ALJ's decision is not supported by substantial evidence or he committed an error of law.  See Seavey v. Barnhart, 276 F.3d at 10 (citing 42 U.S.C. § 405(g) and Ward, 211 F.3d at 655); see also Freeman v. Barnhart, 274 F.3d 606, 609 (1st Cir. 2001).  In the case at bar, the ALJ did not adequately discuss the relevant evidence regarding plaintiff's functional ability to perform her past job.  The Commissioner's decision at step four (Tr. 24, ¶ 8) is therefore vacated and a remand is required.  See Seavey v. Barnhart, 276 F.3d at 12.  For reasons discussed in the previous section, the Commissioner's decision at steps two and three and the RFC determination is affirmed.  See generally Tavarez v. Commissioner of Social Security, 2005 WL 1530841, at *3 (1st Cir. June 30, 2005) (affirming in part and vacating in part lower court's opinion "with instructions to remand to the Commissioner for further proceedings consistent with this opinion"); Douglas v. Commissioner of Social Security, 832 F.Supp.2d 813, 817 (S.D.Ohio 2011) (affirming in part and vacating in part Commissioner's decision remanding action); Connolly v. Astrue, 2011 WL 6888645, at *9 (D.Mass. Dec. 30, 2011) (allowing in part and denying in part motion to reverse and motion to affirm and entering order remanding case "for further proceedings consistent with this opinion"); O'Neal v. Commissioner of Social Security, 2010 WL 5758964, at *1 (W.D.Mich. Feb. 9, 2010).

To complete the record, this court turns to plaintiff's remaining argument that the ALJ erred by not obtaining the testimony of a VE at step four. "'The claimant is the primary source for vocational documentation, and statements by the claimant regarding past work are generally sufficient for determining the skill level, exertional demands and non-exertional demands of such work.'" Santiago v. Secretary of Health and Human Services, 944 F.2d at 5 (quoting SSR 82-62, 1982 WL 31386, at *3). The ALJ is therefore "entitled to rely upon claimant's own description of the duties involved," id., and a VE is not necessarily required. As explained in an unpublished First Circuit opinion regarding the "claimant's complaint that the ALJ failed to elicit vocational expert testimony concerning the impact of her non-exertional limitations on her ability to perform past work, the short answer is that at step four of the sequential analysis the claimant is the primary source for vocational documentation." Cushman v. Apfel, 2000 WL 227935, at *1 (1st Cir. Feb 18, 2000). Accordingly, the ALJ was not required to retain a VE to support his findings at step four.

CONCLUSION

In accordance with the foregoing discussion, the motion to reverse and remand the decision of the Commissioner (Docket

Entry # 16) and the motion to affirm the decision of the

Commissioner (Docket Entry # 21) are **ALLOWED** in part and **DENIED**

in part.

/s/ Marianne B. Bowler
**MARIANNE B. BOWLER**
United States Magistrate Judge